Wally Aleman and his wife Sondra Aleman sued Benchmark Homes, Inc. ("Benchmark"), and James E. Ladner, its president. The defendants moved to compel the plaintiffs to arbitrate their claims. The court denied the motion to compel arbitration. The defendants appeal from the order denying their motion. We reverse and remand.
In early 1997, Benchmark agreed to sell to the Alemans Lot 16 in the Pleasant View subdivision located in Loxley, and to construct a house on the lot for them. On February 7, 1997, the parties executed a "Residential Construction and Lot Purchase Agreement" ("the construction contract"). The construction contract contained an arbitration clause, numbered Paragraph 13.F. of the section entitled "Miscellaneous." Paragraph 13.F. reads:
 "Arbitration. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, or the transaction contemplated hereby, shall be settled by arbitration administered in accordance with the applicable rules of the American Arbitration Association, except as set forth below, and judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. The arbitrators must be licensed to sell real estate in the State of Alabama and be actively engaged in the business of real estate sales in Baldwin County [or] Mobile County, Alabama."
Benchmark says it substantially completed construction of the Alemans' house in July 1997. On July 30, 1997, the Alemans executed a note and mortgage to Norwest Mortgage Company to obtain financing to purchase the lot and house from Benchmark. On August 31, 1997, the Alemans signed a "Limited New Home Warranty Agreement" ("the warranty *Page 1103 
agreement"), which is referenced in, and incorporated into, the construction contract. The warranty agreement also contains an arbitration clause, which is numbered Paragraph 11; it reads:
 "Arbitration. Any dispute between the Seller and the Buyer as to whether the Seller has performed its obligations under this Limited Warranty Agreement to repair, replace or pay to the Buyer the reasonable cost of repairing or replacing any Latent Defect covered hereunder shall be submitted to arbitration conducted pursuant to the Construction Industry Rules of the American Arbitration Association. The Seller and the Buyer acknowledge that this Limited Warranty Agreement necessarily involves interstate commerce by virtue of the materials and components contained in the Dwelling and agree to be bound by the decision of the arbitrator with respect to any dispute submitted to arbitration pursuant to the provisions of this paragraph. The arbitrator shall determine which portion of the fees and expenses charged by the arbitrator shall be paid by each of the parties."
Shortly after signing the warranty agreement, according to the Alemans' complaint, they learned that Benchmark had constructed a retention pond in their backyard. Their complaint contained this statement:
 "Much to their dismay, after payment was made [to Benchmark] and they moved into the house, the Alemans learned for the first time that they could not fill-in, landscape, or otherwise use and enjoy a substantial portion of their backyard because Benchmark Homes had constructed a retention pond in the Alemans' yard to hold water that drains from other parts of the subdivision. Never during the transactions or construction of the house did an agent, employee and/or representative of Benchmark Homes disclose the construction of the retention pond to the Alemans. In fact, Benchmark Homes and its agents, employees, and/or representatives concealed this fact from the Alemans in order to induce them to enter into these transactions and to ensure that the transactions would be completed and that Benchmark Homes would receive the Alemans' money."
On August 31, 1998, the Alemans sued Benchmark; Ladner; Jerry Long, a Benchmark employee who had supervised the construction of the Alemans' house; and Vickey Johnson, a Benchmark employee who the Alemans say, along with Ladner, had represented Benchmark in the transaction with them. The Alemans' complaint alleged that the defendants had fraudulently suppressed from them the fact that a retention pond would be constructed on Lot 16, that the defendants fraudulently induced them to enter into the construction contract, and that the defendants breached the construction contract. The Alemans sought to rescind the construction contract and sought compensatory and punitive damages.
Benchmark and Ladner answered the complaint in October 1998; then, in December 1998, they moved to compel arbitration, pursuant to Paragraph 13.F. of the construction contract and Paragraph 11 of the warranty agreement. The Alemans opposed the motion to compel arbitration. They argued that in their complaint they had made no claims pursuant to the warranty agreement and, therefore, the warranty agreement did not apply. Because the warranty agreement did not apply, they said, the only arbitration clause that could apply to this case was that contained in the construction contract. They argued that the focus of their complaint concerned the real estate they bought in connection *Page 1104 
with their house and, therefore, they said, their allegations did not "trigger interstate commerce." In response, Benchmark argued that the question was not whether the allegations in the Alemans' complaint involved interstate commerce, but whether the contract in which the arbitration clause is contained involved interstate commerce. Benchmark submitted evidence regarding the effect the construction contract had upon interstate commerce during the construction of the Alemans' house. The record also contains a document entitled "Parties' Notice of Stipulation as to Facts Regarding Defendant's [sic] Motion to Compel Arbitration," which states:
 "1. On or about February 7, 1997, plaintiffs Wally Aleman and Sondra Aleman and defendant Benchmark Homes, Inc., entered into a Residential Construction and Lot Purchase Agreement. . . .
 "2. Materials and components used in the construction of the subject dwelling involved interstate commerce by virtue of the interstate shipment of said materials and components."
The trial court denied the motion to compel arbitration.
Benchmark argues that all of the allegations in the Alemans' complaint arise from the construction contract, which it says involves interstate commerce, as Benchmark says the parties stipulated, and, Benchmark says, as agreed by the parties in the warranty agreement. The Alemans argue that the construction contract "evidenced two separate transactions: (1) the purchase of a parcel of land; and (2) the construction of a residence on this parcel of land." This document, they contend, constituted two separate and divisible contracts. The contract for the purchase of the parcel of land, they say, was an entirely intrastate contract that involved the purchase of land located in Alabama by purchasers who were Alabama residents from a seller that was an Alabama corporation. The Alemans admit that the contract for the construction of the house on the land had an effect upon interstate commerce because it involved the use of materials from outside the state. However, they maintain that their claims against the defendants do not arise out of what they insist is a separate, divisible contract for the construction of their house. Their claims, they say, "relate only to the separate, divisible contract involving [their] purchase of Lot 16."
We disagree with the Alemans' characterization of the construction contract as two separate, divisible contracts. Title 9 U.S.C. § 2
(Federal Arbitration Act, § 2) applies to an arbitration agreement appearing in "a contract evidencing a transaction involving commerce." The arbitration agreement is enforceable as to a controversy arising out of that transaction. The language of 9 U.S.C. § 2 does not apply the term "involving commerce" to the controversy, but to the contract. At a later point in § 2, the FAA speaks of arbitrability where a party refuses to perform "any part" of the contract.
Alabama law governs the question of the severability of a contract. "`A test of severability which has frequently been applied is to the effect that, if the consideration is single, the contract is entire, but if the consideration is either expressly or by necessary implication apportioned the contract will be regarded as severable.'" City of Albanyv. Spragins, 208 Ala. 122, 127, 93 So. 803, 808 (1922) (quoting 13 CorpusJuris at 563). See, also, Liles v. Flatley, 643 So.2d 947 (Ala. 1994);Mooney v. Weaver, 262 Ala. 392, 79 So.2d 3 (1955); Blythe v. Embry,36 Ala. App. 596, 61 So.2d 142 (1952). A review of the construction contract indicates that the Alemans agreed to purchase the lot from Benchmark and *Page 1105 
to have Benchmark construct a house on that lot for a certain purchase price, pursuant to a single agreement. The contract states:
 "1. THE UNDERSIGNED BUYER (whether one or more) agrees to buy Lot 16 of Pleasant View, as shown on the subdivision's recorded plat, and the improvements to be constructed (or being constructed) thereon by Seller. Seller agrees to construct (or complete the construction of) the improvements and to sell the Lot and the improvements to Buyer. The subdivision is located at Loxley, Baldwin County, Alabama. The Purchase Price is $62,900.00."
Our conclusion that the contract for the purchase of the lot and the construction of the house is not severable is further supported by Paragraph 3 of the construction contract:
 "3. CONSTRUCTION/DESCRIPTION OF IMPROVEMENTS. Seller and Buyer have agreed that Seller's stock plan # 1185 Trent 2/2 S/C standard is the basis for the improvements to be built, with certain modifications. . . . When the blueprints become available, if both parties approve them, such approval shall be evidenced by the initials of each party on Seller's copy of the blueprints. If both parties do not approve the blueprints and the parties do not agree to the modifications necessary to make the blueprints acceptable to both parties, then the Earnest Money Deposit, less the costs incurred by Seller to have the blueprints prepared and any other costs incurred by Seller, shall be returned to Buyer, and both parties shall be deemed released from this Agreement. If the blueprints are mutually approved, Seller agrees to build or cause to be built and delivered to Buyer at closing a residential structure substantially in accordance with such blueprints and the specifications as attached hereto and signed for identification by Buyer and Seller. . . ."
Once a motion to compel arbitration has been made and supported, the party opposing the enforcement of the arbitration provision has the burden to present evidence indicating that the alleged agreement to arbitrate is not valid or does not apply to the dispute in question. TranSouth Fin.Corp. v. Bell, 739 So.2d 1110 (Ala. 1999). The Alemans do not allege that the arbitration agreement is not valid, and they have not shown that their purchase of the house was a separate transaction so as to make the arbitration agreement inapplicable to this action. As it is written, the contract document indicates the Alemans did not enter into a contract for the purchase of raw land alone; therefore, the construction of the house was an integral part of their agreement with Benchmark.
Because we conclude that the Alemans' agreement to purchase the lot and the house constitutes a single contract, Benchmark and Ladner are entitled to enforce the arbitration agreement contained in that contract. The trial court erred in denying the motion to compel arbitration. The order denying that motion is therefore reversed, and the cause is remanded.
REVERSED AND REMANDED.
HOOPER, C.J., and MADDOX, HOUSTON, SEE, BROWN, JOHNSTONE, and ENGLAND, JJ., concur. *Page 1106