824 So.2d 668 (2001)
SELMA MEDICAL CENTER, INC., d/b/a Columbia Four Rivers Medical Center
v.
Dr. Wilfred Joseph FONTENOT et al.
1991793.
Supreme Court of Alabama.
August 3, 2001.
Rehearing Denied January 11, 2002.
Joe A. Joseph and J. Dawn Smith of Lange, Simpson, Robinson & Somerville, L.L.P., Birmingham, for appellant.
Kathleen B. Morris of Morris & McDermott, L.L.C., Montgomery, for appellees.
SEE, Justice.
The defendant, Selma Medical Center, Inc., d/b/a Columbia Four Rivers Medical Center (the "Hospital") appeals from the trial court's order enjoining the arbitration proceeding it had initiated in a dispute with Dr. Wilfred Joseph Fontenot, Dr. David Christopher Braswell III, and a corporation of which they were shareholders, Selma Anesthesia & Pain Management, P.C. (all three referred to hereinafter as the "Physicians"). The trial court granted the Physicians' motion to stay arbitration proceedings on the ground that the Hospital had not met its burden of demonstrating that the transactions at issue "involve or have any substantial effect on interstate commerce." We reverse and remand.

*669 I.
In 1996, the Hospital, realizing that the Selma community needed at least one more anesthesiologist, contacted Dr. David Braswell III and Dr. Wilfred Joseph Fontenot, who were working in South Carolina, to recruit them to relocate to Selma. At that time, both Dr. Braswell and Dr. Fontenot were completing their anesthesia residencies. Over the course of several months, Dr. Braswell and Dr. Fontenot traveled to Selma to meet with Robert Bigley, the Hospital's chief executive officer, and with other members of the Hospital's staff, to negotiate personal-services contracts calling for the doctors to relocate their medical practices to Alabama.
On October 21, 1996,[1] the Hospital entered two separate, but identical, "Recruiting Agreements" (the "Agreements") with Drs. Braswell and Fontenot (each agreement also with Selma Anesthesia & Pain Management, P.C.).[2] Under the Agreements, the Physicians would relocate their medical practices from South Carolina and maintain a full-time medical practice in Selma, where they would be the exclusive providers of all anesthesia services performed at the Hospital.
The Agreements provide that the Hospital guaranteed Drs. Braswell and Fontenot $500,000 in gross cash receipts for the one-year period January 6, 1997, through January 5, 1998 (the "Guarantee Period"), but that if the Physicians'"Net Collectible Revenue"[3] exceeded $500,000 during that period, they would repay the Hospital the difference. The Agreements provide for binding arbitration, to be conducted in accordance with the rules of the American Arbitration Association.[4] By their terms, the Agreements were not to be effective or legally binding on the parties until "reviewed and approved in writing by a Senior Vice President or the President of the owner of the Hospital and by the Hospital's Legal Counsel."
The Hospital claimed, but the Physicians disputed, that the Physicians owed the Hospital excess revenue collected during the period January 6, 1997, through January 5, 1998. On April 8, 1999, the Hospital filed a "Demand for Arbitration" with the American Arbitration Association ("AAA"), seeking reimbursement of "approximately $325,583.20 plus any applicable interest, fees, and/or costs," advanced under the "Net Collectible Revenue Guarantee" of the Agreement.
The Physicians did not submit their selections of arbitrators from the AAA panel, as is required under the Agreements and by the American Arbitration Association,[5] *670 but, instead, sought and received two extensions to the deadlines set by the AAA.[6] When the Physicians still failed to submit their selections of arbitrators, the AAA appointed the arbitrators that had been selected by the Hospital.[7] The Physicians then refused to participate further in the arbitration, despite the Arbitration Panel's invitation to them to submit evidence supporting their allegations of fraud in the procurement of the Agreements.
The hearing by the Arbitration Panel was scheduled for May 12, 2000, in Birmingham. On May 1, 2000, in the Circuit Court of Montgomery County, the Physicians filed a document styled "Plaintiffs' Complaint for Declaratory Judgment and Motion for Stay of Arbitration." At the same time, they moved for a temporary restraining order or for a preliminary injunction. The Physicians alleged that (1) the Agreements are intrastate in nature, and, therefore, do not impact interstate commerce; (2) the arbitration provisions violate Alabama public policy; (3) the Hospital procured the Agreements through fraud, deceit, and misrepresentation and by denying access to counsel; (4) the Agreements were "boilerplate" in nature and not the subject of "arm's-length negotiations"; (5) the issue of arbitration is one initially for the court; and (6) the arbitration proceedings are unfair and unjust and present a conflict of interest on the part of one of the members of the Arbitration Panel.[8]
In support of their complaint for a declaratory judgment and their motion for a temporary restraining order, the Physicians submitted mirror-image affidavits of Drs. Braswell and Fontenot. Dr. Fontenot's affidavit states, in pertinent part:
"I am ... a resident of Montgomery County, Alabama. I am a physician in Montgomery, Alabama. Prior to moving to Montgomery, I was a partner at Selma Anesthesia & Pain Management, P.C., which was an Alabama Professional Corporation, organized in Dallas *671 County, Alabama, along with Dr. Braswell.
"On October 31, 1996, I traveled with Dr. Braswell to Selma, Alabama to meet with Mr. Robert Bigley, Hospital Chief Executive Officer of Selma Medical Center, Inc., in order to sign the necessary contract papers as required by Selma Medical Center. On November 1, 1996 Dr. Braswell and myself met with Mr. Bigley and signed the personal services contracts and other related documents. I was advised that the legal counsel for Selma Medical Center would also have to review the documents and approve them prior to the contract becoming binding on all parties. Nevertheless, based on the requirements of the contract and the deadlines set out therein, I moved my family to Selma, Alabama in January of 1997 and began working for Selma Medical Center.
"To the best of my knowledge all of the paperwork concerning the contract between Selma Anesthesia & Pain Management, Dr. Fontenot, myself, Selma Medical Center and its representatives [was] originally signed and finalized in Selma, Alabama. During the time that I worked in Selma, I never treated or provided services to anyone except those patients in the Selma community as per the contract provisions."
The trial court directed the parties to submit evidence, by way of affidavit, addressing the question whether the Agreements were interstate or intrastate in nature. The Hospital filed the affidavit of Robert Bigley, the former chief executive officer of the Hospital, who had been responsible for the negotiations that led up to the execution of the October 21, 1996, recruiting agreements. Mr. Bigley's affidavit stated, in pertinent part:
"2. I was formerly employed by Selma Medical Center Hospital, Inc., d/b/a Columbia Four Rivers Medical Center (the `Hospital') as Chief Executive Officer (`CEO') from July, 1995 to April, 1997. The Hospital was an Alabama corporation, located in Selma, AL.
". . . .
"7. As stated in paragraph 8 of the Agreements, the objective of the Hospital in entering into the Agreements was to encourage the Physicians to relocate to Selma, Alabama and `practice medicine and provide professional services to patients in the [Selma] Community.'
"8. During the negotiations preceding the Agreements, the Physicians traveled from South Carolina to Selma, Alabama and met with me and other Hospital employees and other physicians on the active medical staff of the Hospital.
"9. In addition to the income guarantee provided for in the Net Collectible Revenue-Addendum (A) portion of the Agreements, the Hospital agreed to pay the Physicians $15,000 each for expenses `incurred by Physicians in moving [their] personal effects and household furnishings from South Carolina to Selma ...' pursuant to the Relocation-Addendum (D) to the Agreements to pay the Physicians $10,000 each to assist in the `start up expenditures, marketing and other costs ... incurred in locating [their] practice in Selma, Alabama.'
"10. In January 1997, the Physicians commenced practicing medicine in Selma, Alabama pursuant to the Agreements and were the exclusive providers to the Hospital, pursuant to the Professional Services Agreement-Exclusive Provider-Addendum (B) portion of the Agreements.
"11. The Hospital was at the time of the Agreements, and for some time thereafter, an affiliate of Columbia/HCA Healthcare Corporation (`Columbia'), a *672 Tennessee corporation with its principal offices in Nashville, Tennessee.
"12. As set forth in paragraph 13 of the Agreements, the Agreements would not become effective or binding on the Physicians or the Hospital until they were reviewed and approved in writing by a Senior Vice President or the President of Columbia and by the Hospital's Legal counsel. The Agreements were, in fact reviewed and approved by Wayne Gower, a Senior Vice President of Columbia and Stuart McCloy, an in-house attorney with Columbia, both of whom worked in Columbia's offices in Nashville, Tennessee. The Agreements were drafted by Columbia's legal counsel.
". . . .
"14. The Physicians did in fact relocate to Selma, Alabama from South Carolina in approximately January 1997, pursuant to the Agreements, and began providing medical and professional services to the Hospital in the Selma, Alabama community. I was informed by the Physicians that Mr. Robert Hale in South Carolina was handling the Physicians' billing.
"15. As a health care provider, much of the Hospital's revenues were derived from federally funded Medicare or Medicaid programs which are administered by the Health Care Financing Administration (`HCFA'). HCFA has an arrangement with Blue Cross and Blue Shield of Alabama to serve as its intermediary for the programs in Alabama.
"16. The Hospital provided health care services to many out-of-state residents, particularly trauma patients who became injured or ill while in the Selma, Alabama area. Out-of-state residents requiring anesthesia services at the Hospital during the period of time the Physicians were the exclusive providers of such services would necessarily have received such services from the Physicians or their employees.
"17. When treating such out-of-state patients, the Hospital would have filed the Hospital's claims for reimbursement with such patients' private insurers or the Medicaid intermediaries for their respective states, including patients who would have received anesthesia services from the Physicians at the Hospital. Many of the more prevalent private health care [insurers] are national companies that are headquartered outside of Alabama. Some of the Hospital's claims for reimbursement, including claims for reimbursement relating to patients treated by the Physicians, were handled by an out of state third-party billing company.
"18. The Hospital was one of the hospitals that were affiliated with Columbia in more than half of the states in the United States. As part of the Columbia-affiliated network, the Hospital received various types of support services from Columbia, including but not limited to, human resources support, legal and accounting services, and other management-related support."
On May 3, 2000, the court conducted a hearing on the motion for a temporary restraining order. On May 12, 2000, the court granted the Physicians'"Motion for Stay of Arbitration Proceedings." The order also restrained the Hospital from seeking to enforce the arbitration provisions of the Agreements.
The Hospital appeals the trial court's order, arguing that the court erred in granting the Physicians' motion for a stay of arbitration proceedings because, it asserts, the Agreements at issue "substantially affect" interstate commerce and are thus governed by the Federal Arbitration Act ("FAA").

*673 II.
The FAA states:
"A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."
9 U.S.C. § 2. "`The [FAA] preempts contrary state law (specifically, contrary law based on Ala.Code 1975, § 8-1-41(3), and public policy) and renders enforceable a written predispute arbitration agreement but only if that agreement appears in a contract evidencing a transaction that "involves" interstate commerce.'" Tefco Fin. Co. v. Green, 793 So.2d 755, 758 (Ala.2001) (quoting Southern United Fire Ins. Co. v. Knight, 736 So.2d 582, 585-86 (Ala.1999)).[9]
The Physicians, relying on Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759 (Ala.2000), argue that the Agreements are purely "intrastate" in nature and that the arbitration provision contained in the Agreements is therefore unenforceable under § 8-1-43(3), Ala.Code 1975. The Physicians assert that the only facts relevant to this case are the following: (1) that the Agreement was by and between Selma Medical Center, Inc., and the Physicians; (2) that by the time the Agreements were legally binding, the two doctors were Alabama residents;[10] (3) *674 that the Agreements were negotiated and executed in Alabama; (4) that the Agreements were personal-service contracts for the Physicians to provide anesthesiology services in Alabama; and (5) that the Hospital provided no substantive evidence to establish that the contracts in question substantially impact interstate commerce. Accordingly, they argue that under Sisters the Agreements present no "substantial impact" upon interstate commerce and, thus, that the FAA is inapplicable. We disagree.
It is well settled that Congress can regulate three broad categories of activity pursuant to its commerce power: (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce or persons or things in interstate commerce; and (3) those activities having a substantial effect on interstate commerce. Southern United Fire Ins. Co. v. Knight, 736 So.2d 582, 587 n. 3 (Ala.1999) (See, J., concurring specially) (citing United States v. Lopez, 514 U.S. 549, 558-59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995)) (emphasis added). When a case involves allegations of the use of the instrumentalities of interstate commerce, or persons or things in interstate commerce, a court need not reach the question whether the underlying transaction "substantially affects" interstate commerce, because "`[s]uch persons and things, by definition, substantially affectbecause they are components ofinterstate commerce.'" Ex parte Stewart, 786 So.2d 464, 474 (Ala.2000) (on application for rehearing) (Houston, J., concurring specially and quoting the brief of the respondent Birmingham News Company, which cited Lawrence H. Tribe, American Constitutional Law, § 5-5, at 827 (3d ed.2000)); see Reno v. Condon, 528 U.S. 141, 148-49, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000), and Knight, 736 So.2d at 587 n. 3 (stating that because the party seeking arbitration did not allege that the transaction used the channels of interstate commerce or the instrumentalities of interstate commerce, "the underlying transaction must substantially affect interstate commerce if it is to come within the commerce power"). Accordingly, we do not agree with the Physicians that Sisters governs the disposition of this case; the Sisters analysis "`does not apply to cases like this one, where the actual persons and things involved are themselves within the flow of commerce.'" Stewart, 786 So.2d at 474 (on application for rehearing) (Houston, J., concurring specially and quoting the brief of the Birmingham News Company) (emphasis added).
In describing Congress's power to regulate people and things moving in interstate commerce, the United States Supreme Court has referred to the "flow" or "current" of activity. See Stewart, 786 So.2d at 474-75 (on application for rehearing) (Houston, J., concurring specially); Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 195, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974); Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943); Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905). The Court has defined this "flow" to include "the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer." Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 195, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974); see Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (similarly defining "flow" and stating that the phrase "involving commerce," as used in § 2 of the FAA, covers activities within the "flow" of interstate commerce as well as activities having an "effect" on interstate commerce).
*675 The Physicians entered the flow of interstate commerce when they moved from South Carolina to Alabama. In fact, the sole purpose of the Agreements was to place the Physicians within the current of commerce and to move them to Alabama, where they were to become the sole providers of all anesthesia services performed at the Hospital. Accordingly, when the Physicians moved across state lines, they became "persons ... in interstate commerce." Lopez, 514 U.S. at 558, 115 S.Ct. 1624, 131 L.Ed.2d 626; see Reno v. Condon, 528 U.S. 141, 148, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000) ("Because drivers' information [information contained in the records of a state motor-vehicle department] is, in this context, an article of commerce, its sale or release into the interstate stream of business is sufficient to support congressional regulation."). As part of the flow of commerce, then, the Physicians were properly subject to congressional regulation.
The flow of commerce begins before, and ends after, the actual movement across State lines, in order to fulfill the purpose of the overall transaction. See Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943); Stewart, 786 So.2d 464 (on application for rehearing) (Houston, J., concurring specially). In Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905), Justice Holmes, discussing the interstate shipment of livestock, described the continuing flow of commercial activity:
"[C]ommerce among the States is not a technical legal conception, but a practical one, drawn from the course of business. When cattle are sent for sale from a place in one State, with the expectation that they will end their transit, after purchase, in another, and when in effect they do so, with only the interruption necessary to find a purchaser at the stock yards, and when this is a typical, constantly recurring course, the current thus existing is a current of commerce among the States, and the purchase of the cattle is a part and incident of such commerce."
196 U.S. at 398-99, 25 S.Ct. 276 (emphasis added); see Stewart, 786 So.2d at 469 (Houston, J., concurring specially). In Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943), the United States Supreme Court determined that the flow of commerce did not end when a wholesale distributor of paper products stored the goods in his warehouse before delivering them to in-state customers. Rather, the Court reasoned, the current of commerce continued until the products reached the customers for whom they were intended. Id. at 567-68, 63 S.Ct. 332. The Court stated:
"If there is a practical continuity of movement from the manufacturers or suppliers without the state, through respondent's warehouse and on to customers whose prior orders or contracts are being filled, the interstate journey is not ended by reason of a temporary holding of the goods at the warehouse.... The contract or understanding pursuant to which goods are ordered, like a special order, indicates where it was intended that the interstate movement should terminate."
317 U.S. 564, 569, 63 S.Ct. 332, 87 L.Ed. 460 (emphasis added).
The Agreements required the Physicians to move themselves and their medical practices from South Carolina to Selma, Alabama, to provide anesthesia services to patients in the Selma community. Thus, the agreements were themselves an integral part of the Physicians' movement in the flow of commerce, subjecting their personal-service contracts to the jurisdiction of the FAA. See Gulf Oil *676 Corp. v. Copp Paving Co., supra; Allied-Bruce Terminix Cos. v. Dobson, supra (stating that the phrase "involving commerce," as used in § 2 of the FAA, covers activities within the "flow" of interstate commerce). Therefore, we reverse the trial court's order enjoining the arbitration proceedings and remand the case.[11]
REVERSED AND REMANDED.
HOUSTON, BROWN, and STUART, JJ., concur.
JOHNSTONE, J., concurs in the result.
MOORE, C.J., and LYONS, HARWOOD, and WOODALL, JJ., dissent.
JOHNSTONE, Justice (concurring in the result).
I cannot agree that every transaction within the "flow" of interstate commerce will support the application of the Federal Arbitration Act. The power of Congress to regulate a transaction, and thus the applicability of the FAA to the transaction, depend on a substantial effect of the transaction on interstate commerce. Rogers Foundation Repair, Inc. v. Powell, 748 So.2d 869 (Ala.1999); and Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759 (Ala.2000)(Johnstone, J., concurring specially). I agree, however, that these two physicians' moving themselves and their practices in interstate commerce from South Carolina to Alabama substantially affected interstate commerce. Therefore, I concur in the result.
MOORE, Chief Justice (dissenting).
I dissent from the holding that the contracts between the Hospital and the Physicians involved the "flow" of interstate commerce. The main opinion reverses the trial court's judgment, based upon arguments not presented to the trial court and not argued before this Court. The majority concludes that the Physicians entered the "flow" of commerce. However, at trial and on appeal the parties' arguments have addressed only the issue whether the *677 transaction between them "substantially affects" interstate commerce. The United States Supreme Court places the "personsor-things-in-interstate-commerce" argument in a category separate from the "substantially-affects" argument and notes that each of those arguments is based on different caselaw. See United States v. Lopez, 514 U.S. 549, 558-59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). See also Southern United Fire Ins. Co. v. Knight, 736 So.2d 582, 587, n. 3 (Ala.1999) (See, J., concurring specially).[12] While this Court will affirm the judgment of a trial court for any valid reason, even if that reason was not presented to the trial court, it is generally well settled that this Court will not reverse the trial court's judgment on the basis of arguments and issues not presented to it and upon which it never had the opportunity to rule. See Rogers Foundation Repair, Inc. v. Powell, 748 So.2d 869, 872 (Ala.1999); Ex parte Wiginton, 743 So.2d 1071, 1073 (Ala.1999); Smith v. Equifax Servs., Inc., 537 So.2d 463, 465 (Ala.1988); Costarides v. Miller, 374 So.2d 1335, 1338 (Ala.1979)("Appellate courts only reverse for adverse rulings in the trial court.") Therefore, my dissent addresses the arguments actually presented by the parties to this Court.
The trial court found, based on the arguments presented to it, that the Hospital had failed to meet its burden of proof, i.e., its burden of demonstrating that the transaction at issue had any substantial effect on interstate commerce. The Hospital argues on appeal that the contracts in question are governed by the Federal Arbitration Act ("FAA") and not by Ala.Code 1975, § 8-1-41(3), which prohibits the enforcement of arbitration clauses in contracts. For two main reasons, I disagree; I would uphold the judgment of the trial court.
First, because the FAA in its entirety establishes a set of procedures intended to apply only in United States district courts, it has no application in a case such as this, where proper jurisdiction lies exclusively in a court of the State of Alabama. In 1925, when Congress enacted the FAA, Congress was not acting under its power granted in Article I to regulate interstate commerce, but rather, it was acting under its power granted in Article III to prescribe rules of procedure for courts. Second, Congress's power to regulate interstate commerce has been unconstitutionally expanded by the courts. As a result, Congress has been able to reach by federal regulation activities that are clearly intrastate in nature. Courts exacerbate this error by applying the expansive Commerce Clause jurisprudence to the FAA and thereby enforcing federal arbitration law when state laws should control. Thus, the FAA does not apply to this case. Even assuming, for the sake of argument, that it does apply, the contracts executed in this case do not evidence "a transaction involving commerce" under the present caselaw formulation of the "substantial-effects" test.

I. Judicial Expansion of the Federal Arbitration Act
The FAAan act establishing a set of procedural rules intended only for the Courts of the United Statesis entirely inapplicable to the case before us. The FAA provides:

*678 "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle [disputes] by arbitration ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."
9 U.S.C. § 2 (emphasis added). Logically, the term "commerce" can refer only to commerce that Congress has the right to regulate, i.e., "commerce with foreign nations, and among the several states, and with the Indian tribes." U.S. Const., Art. I, § 8. Additionally, Article III of the United States Constitution grants to Congress the power to regulate procedure in the federal courts.[13]
When Congress enacted the FAA in 1925, it was not attempting to regulate interstate commerce under Art. I, § 8, Cl. 3. On the contrary, Congress explicitly stated that the FAA establishes a law of procedure, affecting contracts that contained arbitration clauses. The FAA was enacted pursuant to Congress's Article III powers over federal courts and was intended only for cases in which federal courts had jurisdiction. Since 1925, the United States Supreme Court has expanded the FAA far beyond its original intent, by applying it to state courts. There is no basis in the text of the FAA or in its legislative history for such a broad interpretation of that Act.
The plain language of the FAA demonstrates that Congress intended for it to apply exclusively to federal courts when those courts have jurisdiction over the underlying disputes. Section 3 of the FAA requires a stay of proceedings when an action has been brought "in any of the courts of the United States" and that action is referable to arbitration. 9 U.S.C. § 3. Section 4 provides, as a remedy for a failure to arbitrate, a petition to "any United States district court which ... would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties." 9 U.S.C. § 4. Sections 7, 9, 10, and 11 also refer to United States courts as the appellate authority in the arbitration process. In his dissent in Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995), Justice Thomas noted:
"Despite the FAA's general focus on the federal courts, of course, § 2 itself contains no such explicit limitation. But the text of the statute nonetheless makes clear that § 2 was not meant as a statement of substantive law binding on the States. After all, if § 2 really was understood to `creat[e] federal substantive law requiring the parties to honor arbitration agreements,' then the breach of an arbitration agreement covered by § 2 would give rise to a federal question within the subject-matter jurisdiction of the federal district courts. Yet the ensuing provisions of the Act, without expressly taking away this jurisdiction, clearly rest on the assumption that federal courts have jurisdiction to enforce arbitration agreements only when they would have had jurisdiction over the underlying dispute. In other words, the FAA treats arbitration simply as one *679 means of resolving disputes that lie within the jurisdiction of the federal courts.... [T]he reason that § 2 does not give rise to federal-question jurisdiction is that it was enacted as a purely procedural provision."
513 U.S. at 291, 115 S.Ct. 834 (citations omitted). When read in its entirety, the plain language of the FAA places no obligation upon state courts to enforce arbitration agreements.
The legislative history of the FAA could not indicate more clearly that that Act was enacted to establish rules of procedure for the federal courts and not to establish a substantive rule to apply in state courts. Justice Black, joined by Justices Douglas and Stewart, in his dissent in Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), argued:
"[I]t is clear that Congress in passing the Act relied primarily on its power to create general federal rules to govern federal courts. Over and over again the drafters of the Act assured Congress: `The statute establishes a procedure in the Federal courts.... It rests upon the constitutional provision by which Congress is authorized to establish and control inferior Federal courts. So far as congressional acts relate to the procedure in the Federal courts, they are clearly within the congressional power.' And again: `The primary purpose of the statute is to make enforcible in the Federal courts such agreements for arbitration, and for this purpose Congress rests solely upon its power to prescribe the jurisdiction and duties of the Federal courts.' One cannot read the legislative history without concluding that this power, and not Congress' power to legislate in the area of commerce, was the `principal basis' of the Act. Also opposed to the view that Congress intended to create substantive law to govern commerce and maritime transactions are the frequent statements in the legislative history that the Act was not intended to be `the source of ... substantive law.' As Congressman Graham explained the Act to the House:
"`It does not involve any new principle of law except to provide a simple method ... in order to give enforcement.... It creates no new legislation, grants no new rights, except a remedy to enforce an agreement in commercial contracts and in admiralty contracts.'
"Finally, there are clear indications in the legislative history that the Act was not intended to make arbitration agreements enforceable in state courts or to provide an independent federal-question basis for jurisdiction in federal courts apart from diversity jurisdiction. The absence of both of these effectswhich normally follow from legislation of federal substantive lawseems to militate against the view that Congress was creating a body of federal substantive law."
388 U.S. at 418-20, 87 S.Ct. 1801 (Black, J., dissenting)(footnotes omitted). Seventeen years later, Justice O'Connor, joined by then Justice Rehnquist, reiterated the argument that the Supreme Court has misinterpreted and misapplied the FAA. Dissenting in Southland Corp. v. Keating, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984), she wrote:
"One rarely finds a legislative history as unambiguous as the FAA's. That history establishes conclusively that the 1925 Congress viewed the FAA as a procedural statute, applicable only in federal courts, derived, Congress believed, largely from the federal power to control the jurisdiction of the federal courts.
"In 1925 Congress emphatically believed arbitration to be a matter of `procedure.' *680 At hearings on the Act congressional subcommittees were told: `The theory on which you do this is that you have the right to tell the Federal courts how to proceed.'...
". . . .
"If characterizing the FAA as procedural was not enough, the draftsmen of the Act, the House Report, and the early commentators all flatly stated that the Act was intended to affect only federal court proceedings. Mr. Cohen, the American Bar Association member who drafted the bill, assured two congressional subcommittees in joint hearings:
"`Nor can it be said that the Congress of the United States, directing its own courts ..., would infringe upon the provinces or prerogatives of the States.... [T]he question of the enforcement relates to the law of remedies and not to substantive law. The rule must be changed for the jurisdiction in which the agreement is sought to be enforced.... There is not disposition therefore by means of the Federal bludgeon to force an individual State into an unwilling submission to arbitration enforcement.'"
465 U.S. at 25-27, 104 S.Ct. 852 (footnotes omitted). The House Report on the FAA stated: "The bill declares simply that such agreements for arbitration shall be enforced, and provides a procedure in the Federal courts for their enforcement." H.R.Rep. No. 96 at 2 (1924)(emphasis added). "Whether an agreement for arbitration shall be enforced or not is a question of procedure to be determined by the law court in which the proceeding is brought and not one of substantive law ...." Id. (emphasis added). "[The FAA] creates no new legislation, grants no new rights, except a remedy to enforce an agreement in commercial contracts and in admiralty contracts." 65 Cong. Rec. 1931 (1924).
State courts traditionally controlled the procedural rules governing arbitration, until 1984, when the United States Supreme Court held in Southland Corp. v. Keating, supra, that § 2 of the FAA applied in state courts as well as in federal courts. In Southland, the United States Supreme Court withdrew from state courts the power to require a judicial forum for the resolution of claims that contracting parties had agreed to resolve by arbitration. However, the Southland holding conflicts with United States Supreme Court precedent, which had consistently held that only where Congress evidences a clear and manifest intent to preempt state law will areas traditionally occupied by the states be preempted by federal legislation. See English v. General Elec. Co., 496 U.S. 72, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990); Jones v. Rath Packing Co., 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977); Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). The text of the FAA and its legislative history demonstrate that Congress, when it enacted the FAA, did not manifest a clear intent to preempt state jurisdiction over arbitration agreements.
Moreover, a review of court procedures during the 60 years after Congress enacted the FAA indicates that Congress never intended for the FAA to preempt state jurisdiction. The separation of federal and state courts is a fundamental principle of constitutional law, and it provides the background against which the FAA was enacted in 1925. Arbitration agreements were considered forum-selection clauses in 1925 and were procedural in nature. See Allied-Bruce Terminix Cos., supra (Thomas, J., dissenting). It would have been extraordinary for Congress to attempt to prescribe procedural rules for state courts. Ex parte Gounis, 304 Mo. 428, 263 S.W. 988, 990 (1924). Federal courts did not *681 apply state arbitration statutes because those statutes were not considered substantive law. Thus, state arbitration statutes prescribed procedural rules for state courts, and the FAA prescribed procedural rules for federal courts. State jurisdiction over questions involving arbitration was clearly recognized from 1925 until 1984 when in Southland the Supreme Court extended the scope of the FAA and applied the federal rule of procedure to state-court proceedings.[14] Because Congress wrote and enacted the FAA as a procedural device and intended that it apply exclusively in federal courts, it has no application to the case before usa case between Alabama residents and Alabama corporations, based on state-law claims, for which exclusive jurisdiction lies in a court of the State of Alabama.

II. The Interstate Commerce Clause

A. The "Substantial Effects" Test
A primary reason for the adoption of the United States Constitution in 1787 was to rectify weaknesses the newly formed Union suffered under the Articles of Confederation. 2 Joseph Story, Commentaries on the Constitution of the United States § 1082 (Melville M. Bigelow ed., 5th ed. 1891). Fractionalization of our nation along state lines prevented a unified voice in dealing with problems such as national defense, internal security, and maintenance of an effective commerce with foreign nations and among the several states. Associate Justice Joseph Story wrote concerning the Commerce Clause that "the want of uniformity in the regulations of commerce was a source of perpetual strife and dissatisfaction, of inequalities, and rivalries, and retaliations among the states." Id. "The power over navigation, and over commercial intercourse, was one of the primary objects, for which the people of America adopted their government...." Id. at § 1062.
Thus, state regulations, import duties, and other state restrictions on trade between the States and with foreign nations were to be regulated by the Federal Government in the newly written Constitution. However, the States desired certain limitations on those powers delegated to the new Federal Government, as evidenced by the Tenth Amendment to the United States Constitution.[15] "The Constitution is one of limited and enumerated powers; and none of them can be rightfully exercised beyond the scope of the objects specified in those powers." 2 Joseph Story, Commentaries on the Constitution of the United States, supra, § 1079. It was with this understanding that Congress was given the powers enumerated in Art. I, § 8, Cl. 3, "to regulate commerce with foreign nations, and among the several states."
For the next 150 years, the United States Supreme Court strictly construed the term "interstate commerce." See Kidd v. Pearson, 128 U.S. 1, 9 S.Ct. 6, 32 L.Ed. 346 (1888); United States v. Dewitt, 76 U.S. 41, 19 L.Ed. 593 (1869); Gibbons v. Ogden, 22 U.S. 1, 6 L.Ed. 23 (1824). In Gibbons, Chief Justice John Marshall explained:

*682 "The subject to which the power is next applied, is ... commerce `among the several States.' The word `among' means intermingled with. A thing which is among others, is intermingled with them. Commerce among the States, cannot stop at the external boundary line of each State, but may be introduced into the interior.
"It is not intended to say that these words comprehend that commerce, which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States. Such a power would be inconvenient, and is certainly unnecessary.
"Comprehensive as the word `among' is, it may very properly be restricted to that commerce which concerns more States than one. The phrase is not one which would probably have been selected to indicate the completely interior traffic of the State, because it is not an apt phrase for that purpose; and the enumeration of the particular classes of commerce, to which the power was to be extended, would not have been made, had the intention been to extend the power to every description. The enumeration presupposes something not enumerated; and that something, if we regard the language or the subject of the sentence, must be the exclusively internal commerce of a State. The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the States generally; but not to those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government. The completely internal commerce of a State, then, may be considered as reserved for the State itself."
22 U.S. at 194-95.
Clearly, the authority over internal activity, such as the regulation of turnpikes, roads, toll bridges, ferries, auction licenses, and inspections, and rights to carry goods and passengers by land or water remained with the States, even if such activity
"[a]ffect[s], to a great extent, the foreign trade, and that between the States, as well as the trade among the citizens of the same State. But, although these laws thus affect the trade and commerce with other States, Congress could not interfere, as its power does not reach the regulation of internal trade, which resides exclusively in the States."
Gibbons, 22 U.S. at 65.
In 1925 Congress enacted the FAA, which regulates only contracts evidencing "transaction[s] involving commerce." When Congress enacted the FAA, no United States Supreme Court decisions had extended the power of Congress under the Commerce Clause to encompass positive regulations of state activities, and Congress did not contemplate such an expansive interpretation of its power in enacting this statute. Thus, Congress clearly did not intend the FAA to apply to contracts involving "intrastate" commerce, i.e., commerce occurring completely within a State.
Furthermore, the FAA applied only to "commercial" contracts. This is evident in the explanation of H.R. 646 (the bill that became the FAA), offered on June 6, 1924, when Representative Mills stated: "This bill provides that where there are commercial contracts and there is disagreement under the contract, the court can [en]force an arbitration agreement in the same way as other portions of the contract." ___ Cong. Rec. 11080 (daily ed. June 6, *683 1924)(statement of Rep. Mills). Mr. Graham of Pennsylvania explained: "This bill simply provides for one thing, and that is to give an opportunity to enforce an agreement in commercial contracts and admiralty contractsan agreement to arbitrate, when voluntarily placed in the document by the parties to it." 65 Cong. Rec.1931 (1924).
In the mid 1930s the United States Supreme Court began to change the judicial interpretation of "interstate commerce" to enlarge the power and scope of congressional authority under the Commerce Clause; this change and subsequent expansion have resulted in much confusion and error in our courts.[16] In 1935 the United States Supreme Court classified traditionally intrastate activities as having either a direct or an indirect effect on interstate commerce in order to determine whether the activities were subject to congressional regulation. Activities that affected interstate commerce directly were within Congress's power; activities that affected interstate commerce indirectly were beyond Congress's power. A.L.A. Schechter Poultry Corporation v. United States, 295 U.S. 495, 546, 55 S.Ct. 837, 79 L.Ed. 1570 (1935). The Court stated that the distinction was "a fundamental one, essential to the maintenance of our constitutional system." 295 U.S. at 548, 55 S.Ct. 837.
However, two years after the Schechter decision, the Court abandoned the direct/indirect classifications and expanded the concept of interstate commerce. In NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), the Court held that intrastate activities that "have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions" are within Congress's power to regulate. 301 U.S. at 37, 57 S.Ct. 615. In United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), the Court stated:
"The power of Congress over interstate commerce is not confined to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce."
312 U.S. at 118, 61 S.Ct. 451 (emphasis added). This holding directly conflicts with the explicit language in Article I of the United States Constitution. Thus began the judicial departure from the original and specific language of the Constitution, which granted Congress the power only to "regulate commerce ... among the several states." U.S. Const., Art. I, § 8.
No case provides a more exemplary illustration of the significance of this departure than Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). In 1938, Congress enacted the Agricultural Adjustment Act ("the AAA"), which purported to regulate not only the sale or movement of wheat in interstate commerce but also the actual production of wheat by farmers on their own farmland for their own consumption. The primary reason for *684 the AAA was that United States farmers were producing more wheat than they could sell, and, as a result, wheat prices had fallen sharply. Congress attempted to alleviate the problem by subsidizing farmers and placing limits on their production.
To implement the AAA, officials at the county level established production limits for each farmer; they allotted Mr. Filburn 11.1 acres for growing wheat. Mr. Filburn operated a small farm in Ohio; in 1940, he planted 23 acres of winter wheat, which was to be harvested the following year. Because he harvested 11.9 acres more than was allowed under the quota system, he was fined and received other sanctions. Mr. Filburn sought relief in federal court, arguing that the quota scheme was unconstitutional because his activities were local in nature and, in regulating them, Congress had exceeded its powers of regulation under the Commerce Clause. The district court agreed with Filburn, and the Secretary of Agriculture appealed to the United States Supreme Court.
In rendering its judgment, the Supreme Court first noted that Congress had provided several compelling reasons for passing the AAA in 1938, foremost of which was Congress's finding that wheat surpluses and shortages adversely affected interstate commerce. See 7 U.S.C. § 1331 (entitled "Legislative Finding of Effect on Interstate and Foreign Commerce and Necessity of Regulation"). Congress found that because wheat production had such serious effects on interstate commerce, federal regulation was necessary to minimize recurring surpluses and shortages. The United States Supreme Court, deferring to Congress's findings concerning interstate commerce, held that Congress had the authority, under the Commerce Clause, to impose the quota system and to apply it to Mr. Filburn even if the wheat he harvested was never sold and he simply used it to feed his family, his livestock, and his poultry:
"`Hence the reach of that power extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power.'
". . . .
"... But even if appellee's activities be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce and this irrespective of whether such effect is what might at some earlier time have been defined as `direct' or `indirect.'"
317 U.S. at 124-25, 63 S.Ct. 82 (citations omitted). To the Court, it did not matter that the wheat had not entered interstate commerce, or that it was not grown to be sold. It did not matter that Mr. Filburn's actions were not even considered to be commerce. In fact, the Court candidly admitted that a single farmer who produces food for his own consumption could not possibly have a substantial effect on interstate commerce; nevertheless, the Court stated that the fact "[t]hat [Mr. Filburn's] own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." 317 U.S. at 127-28, 63 S.Ct. 82.
Despite the obvious absence of commerce in Mr. Filburn's activities, the Court considered the effects of his actions on interstate commerce, rather than the actual substance of his activities. In so doing, the Court rejected its prior rulings distinguishing commercial activity from such activities as production, manufacturing, and mining, areas traditionally held not to fall within the category of commerce. See *685 Kidd v. Pearson, supra; Veazie v. Moor, 55 U.S. 568, 14 L.Ed. 545 (1852). Additionally, the Court refused to apply distinctions it had formerly made between "interstate" and "local" activities or "indirect" and "direct" effects on interstate commerce. 317 U.S. at 119-20, 63 S.Ct. 82. The Court concluded that Congress could use its commerce power to stimulate the economy through subsidies and production limits, even if doing so entails the regulation of noncommercial local activities. See 317 U.S. at 121, 63 S.Ct. 82. The reasoning employed in Wickard created a new affirmative channel for the Congressional exercise of power over commerce.
Notwithstanding the importance of the federalist structure of our nation, as intended by the Founders in the Constitution and as recognized by the earlier interpretations of the Commerce Clause, the Wickard Court, in its admitted departure from prior rulings, improperly expanded Congress's power in order to promote a popular social policy of the time. The implications of Wickard cannot be overstated. The holding in that case considerably eroded the distinctions between interstate and intrastate commerce and, in so doing, removed the Commerce Clause restraints on Congressional regulation of activities traditionally recognized as state activities.
Now, almost 60 years after the Justices in Wickard created the "substantial-effects" test, it appears there are no logical limits on what Congress can do under this broad-sweeping test.[17] All human activities, e.g., marriage, education, worship, and recreation, "even if [the] activity be local and though [they] may not be regarded as commerce," have some economic connection or effect on interstate commerce in the aggregate. 317 U.S. at 125, 63 S.Ct. 82. In order to reach such areas that traditionally and constitutionally have been reserved to the states for regulation, Congress need only cast a regulatory net over a large enough class of people whose activities in the aggregate substantially affect interstate commerce. Justice Thomas has recently noted that the substantial-effects test continues to generate problems in current congressional lawmaking and in current jurisprudence:
"[The] `substantial effects' test under the Commerce Clause is inconsistent with the original understanding of Congress' powers and with this Court's early Commerce Clause cases. By continuing to apply this rootless and malleable standard, however circumscribed, the Court has encouraged the Federal Government to persist in its view that the Commerce Clause has virtually no limits. Until this Court replaces its existing Commerce Clause jurisprudence with a standard more consistent with the original understanding, we will continue to see Congress appropriating state police powers under the guise of regulating commerce."
United States v. Morrison, 529 U.S. 598, 627, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (Thomas, J., concurring).[18]
*686 It appears that from 1937 until 1995 the only limits to the power of Congress with regard to the Commerce Clause were limits imposed by Congress itself, but since 1995 the United States Supreme Court has placed some limits on the broad substantial-effects test. See United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), and United States v. Morrison, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). Lopez involved a statute by which Congress had made possession of a gun within a school zone a federal crime. The Government argued that the aggregate effect of violence in schools had a substantial effect on interstate commerce and that Congress therefore had the power under the Commerce Clause to regulate the possession of guns in local school zones. The Court disagreed, however, ruling that the possession of a gun in a local school zone was not an economic activity that substantially affected interstate commerce, even when considered in the aggregate. The Court expressed concern about the constitutional implications of the broad interpretation of interstate commerce argued by the Government. The Court noted that if Congress had the power to regulate crimes in local schools, then Congress would have the power to "regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce." 514 U.S. at 564, 115 S.Ct. 1624.
In Morrison, the law at issue was the Violence Against Women Act of 1994. In an argument similar to the argument it had made in Lopez, the Government contended that violence against women affected interstate commerce and that Congress therefore had the power to enact legislation to regulate such conduct. Chief Justice Rehnquist, writing for the majority, rejected this argument and reaffirmed the principle that only an "economic activity" that substantially affects interstate commerce could be subject to Congressional regulation under the Commerce Clause. Morrison, supra. The Court observed that the same danger that existed with the Gun-Free School Zones Act in Lopez also existed in the Violence Against Women Act at issue in MorrisonCongress's use of the Commerce Clause to "completely obliterate the Constitution's distinction between national and local authority." 529 U.S. at 615, 120 S.Ct. 1740.
The dissenting Justices in both Lopez, 514 U.S. at 604, 627-29, 115 S.Ct. 1624, and Morrison, 529 U.S. at 640-645, 654-55, 120 S.Ct. 1740, claimed that the majority, by recognizing distinctions between federal and state spheres of authority, was guilty of adhering to a discredited jurisprudence of "formalism" that evaluates cases by resort to technical legal concept *687 instead of practical ones, to formulas and to controlling nomenclature, thus binding Congress in "conceptual straight jackets."[19] 529 U.S. at 655, 120 S.Ct. 1740. However, the dissenting Justices conveniently ignored the fact that it was precisely those technical legal concepts of federalism in the Constitution that our forefathers intended to protect the people and the States from an overextension of power by the National Government and to serve, if need be, as a "straitjacket." In the Draft of the Kentucky Resolutions of October 1798, Thomas Jefferson admonished: "In questions of power then let no more be said of confidence in man but bind him down from mischief by the chains of the Constitution."
Clearly, the dissents in Lopez and Morrison demonstrate how far the judiciary has expanded the concept of interstate commerce and how the system of federalism so cherished by our forefathers has been undermined by sociological jurisprudence.[20] Chief Justice Rehnquist astutely observed, regarding Justice Breyer's dissent in Lopez, "Although Justice Breyer argues that acceptance of the Government's rationales would not authorize a general federal police power, he is unable to identify any activity that the States may regulate but Congress may not." 514 U.S. at 564, 115 S.Ct. 1624. The effect of this increase of power under the Commerce Clause has been to allow Congress to expand what it considers legitimate lawmaking beyond the powers granted to it by the Constitution.[21]
As Congress's power under the Commerce Clause has expanded, so too have the reaches of the FAA. Despite the fact that the FAA was enacted in 1925, before the United States Supreme Court eliminated the distinctions between interstate and intrastate commerce in Wickard, and despite the fact that the FAA uses the phrase "involving [interstate] commerce," the Court has proceeded to apply Commerce Clause jurisprudence to its analysis of the FAA. The Court justified its expansion of the statute's explicit language, stating:

*688 "The pre-New Deal Congress that passed the Act in 1925 might well have thought the Commerce Clause did not stretch as far as has turned out to be the case. But, it is not unusual for this Court in similar circumstances to ask whether the scope of the statute should expand along with the expansion of the Commerce Clause power itself, and to answer the question affirmativelyas, for the reasons set forth above, we do here."
Allied-Bruce Terminix Cos. v. Dobson, supra, 513 U.S. 265, 275, 115 S.Ct. 834, 130 L.Ed.2d 753 (citations omitted). Not only did the Congress in 1925 fail to foresee the extension of the FAA by the extension of the Commerce Clause, but it also never intended its enactment of the FAA to be an exercise of its power under the Commerce Clause. Likewise, the drafters of the Constitution never intended that Congress have the power to regulate those areas in which the substantial-effects test is now being used.
Currently, each contract that contains an arbitration clause is thoroughly examined by the courts for some relationship that may exist with another state, in order to determine whether the contract is "interstate" in nature. Courts consider such factors as whether materials from another state were used in performance of the contract, whether the parties to the contract affiliated with anyone from another state, whether any parties received training in another state, whether the object of the services rendered is capable of movement across state lines, etc. See Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759 (Ala.2000).
Courts have exploited Commerce Clause jurisprudence in their analysis of the FAA, so as to transform intrastate activities into interstate commerce, even though only insignificant connections to another state exist. "[T]he smallest connection of an arbitration agreement with interstate commerce is sufficient to bring the agreements within the FAA." Med Center Cars, Inc. v. Smith, 727 So.2d 9, 13 (Ala.1998) (citations omitted). "[I]f any effect on interstate commerce can be found in a commercial transaction, then the transaction is considered to be one involving interstate commerce." Hurst v. Tony Moore Imports, Inc., 699 So.2d 1249, 1257 (Ala.1997)(concluding that the intrastate purchase of an automobile not used in interstate commerce is an "individual activity" within a "broader class of activities" subject to federal regulation). See also Benchmark Homes, Inc. v. Aleman, 786 So.2d 1101 (Ala.2000)(holding that a contract to purchase land and build a house in Alabama affected interstate commerce because some of the components used to build the house came from other states); Coastal Ford, Inc. v. Kidder, 694 So.2d 1285 (Ala.1997)(holding that a dispute between a truck buyer, who was an Alabama resident, and the seller, whose sole place of business was in Alabama, was subject to arbitration because the truck allegedly had traveled in interstate commerce). Words have meaning, and certainly, when our forefathers gave Congress the power to regulate commerce among the states, they did not intend for courts to expand that power so broadly as to subject to federal regulation any transaction that had only trivial connections to other states.

B. The Aggregation Doctrine
In addition to promulgating the substantial-effects test, the Wickard Court analyzed whether Mr. Filburn's activities were interstate or intrastate in nature, by estimating the impact that would occur on interstate commerce if a substantial number of people grew wheat for their own consumption. As discussed above, Congress, *689 in the AAA, designated a class and found that the activities of this class had a substantial effect on interstate commerce. 7 U.S.C. § 1331. In the 1940s, that class was substantial, perhaps numbering in the millions. Because it was clear that the activities of Mr. Filburn alone were not sufficient to substantially affect interstate commerce, the Court reviewed Congress's quotas in the AAA and found that Congress had considered the aggregate effect of wheat production by all persons in Mr. Filburn's class to have a substantial effect on interstate commerce. The Court specifically stated:
"This record leaves us in no doubt that Congress may properly have considered that wheat consumed on the farm where grown if wholly outside the scheme of regulation would have a substantial effect in defeating and obstructing its purpose to stimulate trade therein at increased prices."
Wickard v. Filburn, 317 U.S. 111, 128-29, 63 S.Ct. 82, 87 L.Ed. 122.
Although the Wickard Court merely deferred to Congress's findings when it considered Mr. Filburn's intrastate activities in the aggregate, courts today exacerbate this error of aggregation and apply it in the context of the FAA. In the FAA, Congress did not identify a class that, in the aggregate, could have a substantial effect on interstate commerce, because Congress had no intent to regulate interstate commerce.[22] Rather, Congress stated very clearly that the FAA was a regulation of procedure in federal courts for cases concerning contracts involving interstate commerce. Therefore, in applying the FAA, courts attempt to determine on a case-bycase basis the class involved in the activity at issue, and to hypothesize as to whether this activity, if performed in some determinable aggregate, would have a substantial effect on interstate commerce. In applying the FAA, where Congress has made no findings and has delineated no class, such a procedure leads to inconsistent results among the courts.
Courts today act as legislative bodies in applying federal regulation to an area that Congress never intended to regulate. Consider Mr. Filburn's situation in Wickard. Congress had made the legislative determination that certain activities in the aggregate affect interstate commerce. Once Congress passed the law establishing quotas, the courts were to apply that rule of law to the facts of particular cases. The courts only had to determine the amount of wheat a farmer had produced and then apply the AAA to his case. If he planted more than the law allowed, then he was guilty. The AAA did not leave trial courts in the position of attempting to determine on a case-by-case basis whether a farmer's conduct substantially affected interstate commerce. That was a question for Congress. A court could not possibly determine on its own whether a particular farmer's production "substantially affected" interstate commerce. A court is not designed, funded, or empowered to make that kind of legislative judgment. If the trial courts following the AAA had been placed in a position of deciding the effect on interstate commerce each case had, they could not have utilized the aggregate-effect *690 doctrine, because no class would have been identified by Congress. They would have been trying to determine, case by case, the effect one farmer's activities had on interstate commercewhether it was "substantial" or not. Because Congress did not make findings when it enacted the FAA, in each case a court must now decide prospectively whether the transaction under consideration will substantially affect interstate commerce.
Even Justice Breyer, in Lopez, recognized that Congress must make such an aggregate-effect determination because only by finding a significant factual connection, which he referred to as a "rational basis," between the regulated activity and interstate commerce, could a substantial effect exist:
"[T]he Constitution requires us to judge the connection between a regulated activity and interstate commerce, not directly, but at one remove. Courts must give Congress a degree of leeway in determining the existence of a significant factual connection between the regulated activity and interstate commerce both because the Constitution delegates the commerce power directly to Congress and because the determination requires an empirical judgment of a kind that a legislature is more likely than a court to make with accuracy. The traditional words `rational basis' capture this leeway. Thus, the specific question before us, as the Court recognizes, is not whether the `regulated activities sufficiently affected interstate commerce' but, rather, whether Congress could have had `a rational basis' for so concluding."
Lopez, 514 U.S. at 616-17, 115 S.Ct. 1624 (Breyer, J., dissenting) (citations omitted).
Although it erred in eliminating the distinctions between interstate and intrastate commerce, the United States Supreme Court in Wickard did exactly what Justice Breyer said was required in Lopez. It made a significant factual connection between the regulated activity and interstate commerce and formulated a rule therefrom. The United States Supreme Court recognized in Wickard the rationale used by Congress to regulate the activity in question. A court's role in cases arising under the FAA, however, is vastly different. Under the FAA, courts must make legislative-type judgments on a case-bycase basis. A review of the FAA and its legislative history makes it apparent that Congress never attempted to demonstrate a "rational basis," as Justice Breyer in Lopez suggested was required, between interstate commerce and the regulation of contracts involving arbitration, nor did Congress determine a substantial effect such contracts have on interstate commerce. This is so, because Congress never intended to regulate interstate commerce at all. Although it is true that Congress made the observation that arbitration was an attractive alternative to some parties, it left open the choice whether to enter an agreement to arbitrate. The provisions of the FAA affect only those who would choose arbitration, and such a class is impossible to ascertain judicially. Each time a case arises under the FAA, a court attempts to determine if the individual contract or the transaction evidenced by a contract substantially affects interstate commerce. Such an analysis is an improper application of the aggregate-effects analysis.
The Supreme Court in Lopez, Morrison, and Wickard was exercising its power to interpret statutes and to decide whether Congress's regulation of interstate commerce under Art. I, § 8, Cl. 3, was constitutional. In each case, the Court proceeded to examine the "basis" for the regulation at issue and to determine *691 whether interstate commerce was affected. Courts cannot examine any rational basis for regulation under the FAA, because none was ever intended or stated by Congress, nor was a basis necessary, because Congress has the exclusive right to regulate procedure in federal courts, under Article III. To use a substantial-effects test to determine whether an activity is interstate in nature is meaningless and is an attempt by courts to legislate on a case-by-case basis in an area where Congress never intended to legislate.

III. Application
In the case now before this Court, Selma Medical Center, Inc., d/b/a Columbia Four Rivers Medical Center v. Dr. Wilfred Fontenot et al., the appellants argue that the contracts executed between the Hospital and the Physicians "substantially affect" interstate commerce. I have discussed at length the reasons why the FAA is a rule of procedure and the reasons why I find the substantial-effects test an inappropriate standard for a court to use to analyze the nature of one transaction. However, even if I evaluated the transactions now before us using the prevailing standards, I would find that these contracts do not require specific performance of the arbitration clause. The Hospital entered into contracts with the Physicians and with Selma Anesthesia and Pain Management; these contracts were executed in Alabama. The contracts, as drafted by the Hospital, contained provisions stipulating that the contracts would not become legally effective and binding until the Hospital had reviewed them. When the contracts became legally effective and binding, the Physicians were Alabama residents, Selma Anesthesia and Pain Management was an Alabama corporation, and the Hospital was an Alabama corporation. The contracts stipulated that the Physicians would provide anesthesiology services to the "community," which was defined as Selma, Alabama. There is simply no evidence indicating that this transaction could have any substantial effect on interstate commerce.
Because no evidence indicates that the transactions before us affect interstate commerce in any way, the prevailing standards would require this Court to consider those transactions in the aggregate. Because Congress has not designated a class or determined an effect of such contracts on the flow of commerce, such a consideration is inappropriate. Is there another group of doctors who have entered contracts with hospitals with which we can aggregate those contracts before us to show a substantial effect on interstate commerce? Perhaps all other doctors would choose contracts without arbitration. Could a court possibly determine a class to aggregate? Have goods crossed state lines to such a degree as to affect commerce with another state or other states? Have interstate carriers lost substantial business? The answer is obvious. There is no such evidence here. In fact, it is nearly impossible for any party to meet that burden.
The real issue in this case is not whether the contracts "substantially affect" interstate commerce, because, as explained above, they do not; the real issue is how in our jurisprudence we have reached a point at which we could even believe that they ever could. Congress expanded its power beyond the bounds of the Commerce Clause, and the courts acquiesced to or approved of that usurpation of power. Now, the courts use the expanded Commerce Clause to enlarge their own power. The reality is that we have redefined words, ignored legislative intent, and contradicted reason and logicall to reach a desired result. I fear the precedent that we have established has resulted in a permanent *692 confusion in law and a near elimination of any separation of federal and state powers.

IV. Conclusion
What Congress did not do in 1925, the courts of our land have done today. The courts have determined that the FAA is now a substantive rule which preempts state laws. This determination is explicitly contradicted by the plain language of the FAA and the language of its legislative history. Likewise, the courts now use the broadly redefined substantial-effects test to justify applying the FAA to contracts arising solely in intrastate commerce. The courts once applied the term "substantial effect" to determine the legitimacy of Congress's power to regulate intrastate activities that in the aggregate had a detrimental effect on interstate commerce. Today, courts misuse that term to classify intrastate activities as interstate commerce if any connection, no matter how remote, with another state exists. Courts make these decisions on a case-by-case basis, in the complete absence of any Congressional direction to do so. An aggregate effect on interstate commerce can never be shown by a single transaction, and the drafters of the FAA never intended for courts to go through the process of making case-by-case decisions regarding the effect of a single transaction on interstate commerce in the complete absence of supporting or relevant evidence. Words have meaning and should be construed by courts in the context in which they were used. When we change the meaning of words in our laws, we are the masters of intent and ours becomes a nation ruled by men instead of a nation ruled by laws.
"`I don't know what you mean by "glory,"' Alice said.
"Humpty Dumpty smiled contemptuously. `Of course you don'ttill I tell you. I meant "there's a nice knock-down argument for you!"'
"`But "glory" doesn't mean "a nice knock-down argument,"' Alice objected.
"`When I use a word,' Humpty Dumpty said in a rather scornful tone, `it means just what I choose it to meanneither more nor less.'
"`The question is,' said Alice, `whether you can make words mean different things.'
"`The question is,' said Humpty Dumpty, `which is to be masterthat's all.'"
Through the Looking-Glass and What Alice Found There by Lewis Carroll.
Commerce Clause jurisprudence has expanded far beyond its intended boundaries. Courts have now assumed a role designated in our Constitution for Congress and have breached the fundamental separation of powers our forefathers intended to preserve.
"The necessity of reciprocal checks in the exercise of political power, by dividing and distributing it into different depositories and constituting each the guardian of the public weal against invasion by the other, has been evinced by experiments ancient and modern, some of them in our country and under our own eyes. To preserve them must be as necessary as to institute them."
George Washington, Farewell Address, September 17, 1796.
We have forgotten the glory of our law, and, as a judiciary, should be ashamed for our participation in the destruction of one of the basic premises upon which our Constitution was written, the federal separation of state and national powers. We have misused words, as Humpty Dumpty did, to have them mean only what we choose to have them mean, not what they were originally intended to mean. By doing so, we have become the master over *693 the very Constitution we were sworn to uphold.
WOODALL, Justice (dissenting).
I dissent for three equally compelling reasons. First, the Hospital did not present a flow-of-commerce argument to the trial court. Second, the Hospital has not presented any such argument to this Court. Therefore, the appropriate application of well-established rules of appellate practice and procedure would preclude this Court from using a flow-of-commerce analysis to reverse the trial court's order. Finally, even if the argument was properly before this Court, there is no legal or factual basis for the conclusion that the Physicians were within the flow of interstate commerce.
The trial court properly enjoined the arbitration proceeding initiated by the Hospital, because the Hospital had not met its burden of demonstrating that the transactions at issue involved or had any substantial effect on interstate commerce.
NOTES
[1] It appears from the record that the Agreement was prepared on, and dated, October 21, 1996. However, according to affidavits filed by Dr. Braswell and Dr. Fontenot, the Agreement was not signed until November 1, 1996.
[2] Dr. Braswell and Dr. Fontenot had incorporated Selma Anesthesia & Pain Management, P.C., in Dallas County, Alabama, on January 23, 1997.
[3] The Agreements define "Net Collectible Revenue" as "equal to (1) the amount of the Gross Cash Receipts during the Guarantee Period plus (2) an amount equal to all patient bills not yet issued by Physicians for services rendered during the Guarantee Period plus (3) an amount equal to Physicians' accounts receivable remaining uncollected at the end of the Guarantee Period."
[4] The arbitration provision states:

"12. In the event any dispute shall arise concerning any aspect of this Agreement, such dispute shall be submitted to final and binding arbitration in accordance with rules established by the American Arbitration Association."
[5] Rule 13 of the Commercial Dispute Resolution Procedures promulgated by the AAA, as amended and effective at the time of this dispute, states, in pertinent part:

"If the parties have not appointed an arbitrator and have not provided any other method of appointment, the arbitrator shall be appointed in the following manner:
". . . .
"(b) If the parties are unable to agree upon an arbitrator, each party to the dispute shall have 15 days from the transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable...."
R-13, Appointment from Panel, American Arbitration Association, Commercial Arbitration Rules (as amended and effective Jan. 1, 1999).
[6] The Physicians' counsel requested two extensions of time so that she could meet with her clients and select arbitrators. On August 3, 1999, the AAA granted the Physicians' counsel an extension to August 6, 1999, to choose her arbitrators. On August 4, 1999, the AAA wrote the Physicians' counsel and advised her that should her selections not be made by August 6, the AAA would choose the arbitrators selected by the Hospital. On August 9, 1999, three days after missing the extended selection deadline, counsel requested a further extension. The AAA granted a further extension to August 11, noting that if counsel did not submit a list of arbitrators, the panel named by the Hospital would be chosen by default. Again, counsel missed the deadline, and on August 13 the AAA named the Hospital's selections as a default panel.
[7] Because the Agreements make no provision for the selection of the arbitrators, Rule 13 applies to this case. Under subsection (b), "[i]f a party does not return the list within the time specified, all persons named therein shall be deemed acceptable." R-13, Appointment from Panel, American Arbitration Association, Commercial Arbitration Rules (as amended and effective Jan. 1, 1999).
[8] The Physicians claimed that one of the arbitrators is a "former partner" of the law firm representing the Hospital in this action.
[9] The Chief Justice's dissent asserts that, in enacting the FAA, Congress was acting pursuant to Article III of the Constitution, using its power to prescribe rules of procedure for federal courts. 824 So.2d at 677. Therefore, it argues, the FAA was intended to govern only those causes subject to federal jurisdiction, and is, therefore, entirely inapplicable to this case.

Just as this Court is the final judicial authority on matters of Alabama law, Harrison v. Insurance Co. of North America, 294 Ala. 387, 388, 318 So.2d 253, 253-54 (Ala.1975) ("Since each state is sovereign under our system of government, this Court is the final authority on Alabama law."), so the Supreme Court of the United States is the final judicial authority on matters of federal law, Waterman S.S. Corp. v. Brill, 243 Ala. 25, 29, 9 So.2d 23, 27 (Ala.1942) ("[o]ur task is to construe [Federal] statutes in keeping with the thought of [the Supreme Court of the United States]"). Accordingly, this Court has held, "[a]greements to arbitrate disputes affecting interstate commerce are governed by the Federal Arbitration Act, as that Act is interpreted by the federal courts." Quality Truck & Auto Sales, Inc., v. Yassine, 730 So.2d 1164, 1167 (Ala. 1999) (citing U.S. Const. art I, § 8, cl. 3 (Commerce Clause)); see Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (overruling this Court by making enforceable, as a matter of federal law, a written arbitration provision in a contract evidencing a transaction involving commerce). Because the Supreme Court of the United States has interpreted the FAA to preempt contrary state law and to render enforceable a written predispute arbitration agreement appearing in a contract evidencing a transaction involving interstate commerce, this Court is compelled to abide by that interpretation. See Rogers Foundation Repair, Inc. v. Powell, 748 So.2d 869, 873 (Ala.1999) (See, J., concurring specially) ("By force of Article VI of the Constitution of the United States (the Supremacy Clause), the FAA applies in state courts when an arbitration provision is part of a contract that affects interstate commerce.") (citations omitted); Ex parte Dan Tucker Auto Sales, Inc., 718 So.2d 33, 38 (Ala.1998) (Houston, J., concurring specially) ("Although I disagree with the majority of the United States Supreme Court in its Allied-Bruce interpretation of the Federal Arbitration Act as it applies to state courts, a majority opinion of that Court is part of the law I have taken an oath to uphold."); see also Allied-Bruce, 513 U.S. at 265, 115 S.Ct. 834 (overruling this Court by holding that the FAA preempts contrary state law).
[10] The Physicians contend that the Agreements were not "effective" until January 15, 1997, when they were approved in writing. At that time, the Physicians assert, they were legal residents of the State of Alabama.
[11] It is suggested in dissent that the "flow-of-commerce" analysis is not properly before this Court because the Hospital argued that the Physicians' contracts substantially affected interstate commerce. However, the question squarely before this Court is the scope of the FAAwhether the FAA reaches the inducement of the Physicians to move from South Carolina to Alabama. In enacting the FAA, Congress intended to exercise the full extent of its commerce power. Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. at 276, 115 S.Ct. 834. Congress's power to regulate commerce unquestionably extends to transactions within commerce. In Gibbons v. Ogden, Chief Justice Marshall defined "commerce" and described the commerce power as follows:

"Commerce, undoubtedly is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse...."
"[The Commerce Power] is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution."
22 U.S. (9 Wheat.) 1, 189-90, 196, 6 L.Ed. 23 (1824). By its very nature, a transaction in commerce necessarily "substantially affects" interstate commerce. See Wickard v. Filburn, 317 U.S. 111, 124, 63 S.Ct. 82, 87 L.Ed. 122 (1942) ("`The commerce power is not confined in its exercise to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce, or the exertion of the power of Congress over it, as to make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce.'") (quoting United States v. Wrightwood Dairy Co., 315 U.S. 110, 119, 62 S.Ct. 523, 86 L.Ed. 726 (1942)).
[12] "However, in this case, Southern United [the party seeking to compel arbitration] makes no allegations as to the use of the channels of interstate commerce, the instrumentalities of interstate commerce, or persons or things in interstate commerce. Thus, in this case, the underlying transaction must substantially affect interstate commerce if it is to come within the commerce power." 736 So.2d at 587, n. 3.
[13] Article III provides, in pertinent part:

"Section 1.
"The judicial power of the United States, shall be vested in one supreme court, and in such inferior courts as the congress may from time to time ordain and establish....
"Section 2.
". . . .
"... In all the other cases before mentioned, the supreme court shall have appellate jurisdiction, both as to law and fact, with such exceptions, and under such regulations as the congress shall make."
[14] Justice Scalia correctly observed that the Southland decision is not one that will become "more correct" over time. See Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. at 285, 115 S.Ct. 834 (Scalia, J., dissenting). As a result, Justice Scalia stated that he stands ready to overrule Southland when the issue is properly presented to the Court and four other Justices are willing to concur. See id.
[15] "The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." U.S. Const. amend. X.
[16] Chief Justice Rehnquist, in discussing the categories currently used by courts to determine whether an activity is interstate in nature, admitted that even United States Supreme Court caselaw has not been clear as to what level of effect an activity must have on interstate commerce to fall within Congress's regulatory power, i.e., whether an activity must "affect" or "substantially affect" interstate commerce. See United States v. Lopez, 514 U.S. 549, 558-59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).
[17] "This view of the role of federal government has spread from imposing social controls at the federal level to address perceived injury to the national economy through competition, to attempts by federal Congress to impose social controls on individual behavior wholly removed from economic concerns as exemplified by [United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995),] and [United States v. Morrison, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000)]." Arthur B. Mark III, United States v. Morrison, the Commerce Clause and the Substantial Effects Test: No Substantial Limit on Federal Power, 34 Creighton L.Rev. 675, 738-39 (2001).
[18] Almost 200 years ago, Justice Joseph Story voiced a similar concern over the expansion of Congress's powers under the Commerce Clause:

"It is true that commerce and manufactures are, or may be, intimately connected with each other. A regulation of one may injuriously or beneficially affect the other. But that is not the point in controversy. It is, whether Congress has a right to regulate that, which is not committed to it, under a power which is committed to it, simply because there is or may be, an intimate connection between the powers. If this were admitted, the enumeration of the powers of Congress would be wholly unnecessary and nugatory. Agriculture, colonies, capital, machinery, the wages of labor, the profits of stock, the rents of land, the punctual performance of contracts, and the diffusion of knowledge would all be within the scope of the power; for all of them bear an intimate relation to commerce. The result would be, that the powers of Congress would embrace the widest extent of legislative functions, to the utter demolition of all constitutional boundaries between the state and national governments."
2 Joseph Story, Commentaries on the Constitution of the United States, supra, § 1079.
[19] It is interesting to note that in spite of Justice Breyer's disparagement of attempts to decide cases by "technical legal concepts" or "controlling nomenclature," he gave considerable and lengthy attention to defining the terms "involving" and "affecting" in Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 273-74, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995).
[20] Today, proponents of the substantial-effects test do not deny the impact of the test on the balance of power between state and federal government. They simply claim that disputes over the allocation of commerce powers require political, not judicial, resolution:

"Those changes, taken together, mean that virtually every kind of activity, no matter how local, genuinely can affect commerce, or its conditions, outside the Stateat least when considered in the aggregate.... And that fact makes it close to impossible for courts to develop meaningful subject-matter categories that would exclude some kind of local activities from ordinary Commerce Clause `aggregation' rules without, at the same time, depriving Congress of the power to regulate activities that have a genuine and important effect upon interstate commerce."
529 U.S. at 660, 120 S.Ct. 1740 (Breyer, J., dissenting).
[21] See Gibbs v. Babbitt, 214 F.3d 483 (4th Cir.2000)(holding that shooting a red wolf on private property to protect the landowner's cattle substantially affects interstate commerce); National Ass'n of Home Builders v. Babbitt, 130 F.3d 1041 (D.C.Cir.1997)(holding that killing or "taking" of a species of fly found only in California substantially affects interstate commerce); United States v. Ramey, 24 F.3d 602 (4th Cir.1994), vacated, 217 F.3d 842 (4th Cir.2000)(table)(upholding defendant's conviction under federal arson statute for burning mobile home because supplying the mobile home with electricity from interstate power grid sufficiently affected interstate commerce).
[22] Justice Black, in his dissent in Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), noted that the FAA lacked "any declaration of some national interest to be served or some nationwide comprehensive scheme of regulation to be created." 388 U.S. at 411, n. 3, 87 S.Ct. 1801 (Black, J., dissenting). Justice Black reasoned that the carefully chosen limiting language in the FAA rebutted the majority's conclusion that Congress, in enacting the FAA, intended to exercise a broad power over commerce. See id.