Stokes Chevrolet, Inc. ("the Stokes dealership"), operates a dealership in Clanton that, in addition to the Chevrolet line of the Chevrolet Motors Division of General Motors Corporation ("GM"), sold Chrysler, Plymouth, Dodge, and Jeep vehicles (Stokes's non-GM lines are hereinafter referred to as "the Chrysler assets"). Rick Bush Motors ("Bush") was a GM dealer *Page 1241 
that also operated in Clanton and that had the authority to sell Buick, Oldsmobile, and Pontiac vehicles, and the GMC line of GM. The Stokes dealership was interested in acquiring from Bush assets to be used in the operation of an Oldsmobile, Pontiac, and Buick dealership. Bush's dealership agreement with GM required GM's approval of the sale of its assets to the Stokes dealership.
The Stokes dealership obtained GM's approval and purchased Bush's assets; however, a condition of the approval was the Stokes dealership's agreement to relocate the Chrysler assets to another site in Clanton. Bush and the Stokes dealership consummated their asset purchase agreement on April 6, 1999, and on April 8, 1999, the Stokes dealership and GM consummated a "Relocation Agreement and Business Plan" ("the relocation agreement").
This action arises out of the Stokes dealership's purchase of 63 new GM vehicles from Bush's inventory. The Stokes dealership claims that GM promised that the 63 vehicles would be "reinvoiced" to it if it would agree to sell the vehicles. The Stokes dealership further claims that GM promised that it would receive the three percent "dealer-holdback" credit,[1] the advertising credit, and other interest credits on those vehicles. GM denied making any such promises. Kirk A. Stokes, James H. Stokes, and the Stokes dealership (hereinafter sometimes referred to collectively as "the Stokeses") sued GM and its area market manager, Robert T. Feeley, Jr., alleging fraud, suppression, conversion, negligence, wantonness, and the tort of outrage.
GM's dealership agreement with the Stokes dealership does not contain an arbitration clause. The relocation agreement contains an arbitration clause; that clause provides for the arbitration of "any and all claims, disputes, and controversies between them arising under or relating to this agreement and its negotiation, execution, administration, modification, extension or enforcement." GM and Feeley filed motions to compel arbitration. The trial court denied GM's motion to compel arbitration.[2] GM appeals.
The first issue to be resolved is whether the arbitration clause in the relocation agreement applies to the claims asserted by the Stokeses in this action. If we determine that it does, we must then determine whether the transaction substantially affects interstate commerce.
 I. Standard of Review
"`[T]he standard of review of a trial court's ruling on a motion to compel arbitration at the instance of either party is a de novo
determination of whether the *Page 1242 
trial judge erred on a factual or legal issue to the substantial prejudice of the party seeking review.'" Vann v. First Cmty. CreditCorp., 834 So.2d 751, 752-753 (Ala. 2002) (quoting Ex parte Roberson,749 So.2d 441, 446 (Ala. 1999)).
 II. Does the Arbitration Clause in the Relocation Agreement Apply to This Dispute?
The Stokes dealership contacted GM for financial assistance in acquiring Bush. Negotiations between the Stokes dealership and GM culminated in the execution of the relocation agreement.
According to the Stokeses, the relocation agreement was an agreement separate from GM's alleged promise to reinvoice the 63 vehicles in Bush's inventory. The Stokeses contend that the relocation agreement related to the Stokes dealership's promise to relocate the Chrysler assets to another site in Clanton. Furthermore, according to the Stokeses, the asset purchase agreement with Bush did not include the acquisition of the 63 new GM vehicles. According to the Stokeses, the transaction under which the 63 new GM vehicles in Bush's inventory would be reinvoiced to the Stokes dealership if it would agree to sell the vehicles arose after the Stokes dealership had an agreement "in principal" to purchase the Bush assets.
GM, on the other hand, argues that the dealership agreement between it and the Stokes dealership is inapposite because that agreement deals with the Stokes dealership's purchase of vehicles from GM. The vehicles in dispute, according to GM, were "acquired by the plaintiffs as part of the negotiated purchase of the assets of Rick Bush Motors." GM further contends that the purchase of the 63 vehicles "was not part of the ongoing order of business between a dealer and GM under existing dealer agreements, but was rather a discrete event solely related to the plaintiff's acquisition of the Oldsmobile, Buick and Pontiac franchises — which is absolutely and unmistakably covered by the Relocation Agreement and Business Plan containing the arbitration agreement."
While the dispute as to whether the 63 vehicles were dealt with in the asset purchase agreement between the Stokes dealership and Bush is sharp, it is not material. The relocation agreement sets forth certain "Recitals" and then provides that GM is willing to consent to matters described in the recitals, subject to the terms and conditions set forth in the relocation agreement. The recitals include a statement that the Stokes dealership had obtained, or would obtain immediately after the execution of the agreement, the right to operate an Oldsmobile, Pontiac, and Buick dealership at the Stokes dealership site pursuant to "Dealer Sales and Service Agreements" between it and the Oldsmobile, Pontiac-GMC, and Buick Motor Divisions of GM. The agreement further recites that "Dealer [Stokes] intends to acquire, before or immediately after the execution of this Agreement, certain assets useful in the operation of an Oldsmobile, Pontiac and Buick automobile dealership" (emphasis added). Also recited was that the Stokes dealership would acquire assets useful in the operation of a GMC dealership (the GMC assets") but would sell the GMC assets to GM or its affiliate.
Those recitals refer in general terms to the Stokes dealership's intent without reference to the provisions of any specific agreements such as the asset purchase agreement between the Stokes dealership and Bush. Consequently, whether the transaction involving the transfer of the 63 vehicles from Bush's inventory to the Stokes dealership's inventory was a part of the asset purchase agreement agreed upon in principal before Bush's agreement with *Page 1243 
Stokes was formalized on April 6, 1999, is immaterial. The generality of the reference in the recitals sheds light upon the scope of the transaction, an exercise that becomes necessary in order to apply the terms of the arbitration clause.
Among the terms and conditions agreed upon by GM in exchange for its consent to the activities described in the recitals was a payment of $75,000 by GM to the Stokes dealership for the GMC assets and the payment of an additional $25,000 for discontinuance of the Chrysler line at the Stokes dealership location that was to be used for GM products. Also included in the relocation agreement was an agreement to arbitrate disputes. Paragraph 9, entitled "Disputes — Arbitration," provides, in pertinent part, as follows:
 "Subject to the following provisions of this Section, GM and the Dealer agree to submit to final and binding arbitration, upon either party's written notice, any and all claims, disputes, and controversies between them arising under or relating to this Agreement and its negotiation, execution, administration, modification, extension or enforcement (collectively, `Claims'). Such arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association (AAA) at an AAA regional office nearest the Property."
(Emphasis added.)
We have held that an arbitration clause calling for arbitration of disputes "arising under" an agreement does not cover "`matters or claims independent of the contract or collateral thereto.'" Old Republic Ins.Co. v. Lanier, 644 So.2d 1258, 1261-62 (Ala. 1994) (quoting MediterraneanEnters., Inc. v. Ssangyong, 708 F.2d 1458, 1463 (9th Cir. 1983)). InBama's Best Housing, Inc. v. Hodges, 847 So.2d 300, 303 (Ala. 2002), this Court noted: "However, we have held that where a contract signed by the parties contains a valid arbitration clause that applies to claims `arising out of or relating to' the contract, that clause has a broader application than an arbitration clause that refers only to claims `arising from' the agreement." The arbitration clause in the relocation agreement is entitled to the broader interpretation of its scope by reason of the inclusion within it of the phrase "arising under or relating to."
The arbitration clause provides that claims arising under or relating to the negotiation, execution, administration, modification, extension, or enforcement of the relocation agreement fall within its sweep. The Stokeses maintain that, in addition to money and other considerations set forth in the relocation agreement, additional payments from GM not covered by the written terms of the agreement were orally promised during the negotiations concerning the transaction. The Stokeses sought and obtained financial inducements from GM in connection with this transaction. GM's consent and financial support was vital to the consummation of the Stokes dealership's acquisition of Bush's assets. The Stokeses maintain that further financial inducements are due in connection with the acquisition of the 63 vehicles from Bush. Such a transfer of assets is not a part of an ongoing relationship between GM and the Stokes dealership, and it is therefore not subject to the dealer agreement between the parties. Such an alleged promise was a discrete event related to the Stokes dealership's acquisition of the Oldsmobile, Buick, and Pontiac franchises and, therefore, a claim based on that promise constitutes a claim "arising under or relating to" the "negotiation" of the relocation agreement. The claims made the basis of this action are therefore *Page 1244 
subject to arbitration pursuant to the arbitration clause in the relocation agreement.
 III. Does This Transaction Substantially Affect Interstate Commerce?
Title 9 U.S.C. § 2, a portion of the Federal Arbitration Act, provides: "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." In Liberty NationalLife Insurance Co. v. Douglas, 826 So.2d 806, 809 (Ala. 2002), we held that "[t]he party trying to compel arbitration has the burden of proving the existence of a contract requiring arbitration and proving that that contract involves a transaction that substantially affects interstate commerce."
The Stokeses urge us to follow Sisters of the Visitation v. CochranPlastering Co., 775 So.2d 759 (Ala. 2000), while GM argues that we should overrule Sisters of the Visitation. In Sisters of the Visitation, this Court concluded that a plastering contract for repairs to a church building did not have a substantial effect on interstate commerce. Both parties apparently assume that a case that involved a construction contract setting forth factors to be considered in determining whether the transaction had a substantial effect on interstate commerce must routinely be applied to complex commercial transactions arising in a totally different context. We can determine whether this transaction has a substantial effect on interstate commerce without substantial reliance upon, or disavowal of, the test set forth in Sisters of the Visitation.
GM waited until the day of the hearing on the motions to compel arbitration to submit an affidavit purportedly showing that the transaction has a substantial effect on interstate commerce. The trial court struck the affidavit. GM states, in a footnote in its brief to this Court that the trial court erred in doing so, but it does not cite any authority for its contention. We cannot reverse the order of the trial court where GM has not offered any legal authority for us to do so. See Rule 28(a)(10), Ala.R.App.P.;[3] Whited v. Holmes, 816 So.2d 20, 26
(Ala. 2000). We therefore disregard the affidavit submitted by GM.
The Stokes dealership argues that it is an Alabama corporation, that Kirk Stokes and James Stokes are Alabama residents, and that the vehicles were transported from the Bush lot in Clanton to the Stokes dealership lot in Clanton. Under this view, according to the Stokeses, the transaction can have had no substantial effect on interstate commerce.
The Stokeses, however, invite us to examine the wrong transaction to determine whether there has been a substantial effect on interstate commerce. As previously noted, the Federal Arbitration Act requires a written provision calling for arbitration in a contract evidencing a transaction involving commerce.[4] Once this circumstance is established, a dispute arising out of the contract or transaction must be settled by arbitration. The written provision calling for arbitration appears in the relocation agreement, and the transaction to which that agreement relates is the transaction to which we must *Page 1245 
look in order to determine whether the transaction has a substantial effect on interstate commerce.
Confining ourselves, as we must, to a review of the evidence found within the four corners of the relocation agreement, we can glean that the agreement is between an Alabama corporation and a Delaware corporation operating motor divisions that manufacture a variety of automobiles, many of which will be manufactured by the Delaware corporation for resale by the Stokes dealership; that the Delaware corporation was to pay Stokes $75,000 for certain GMC assets; that Chrysler products were not be sold at the Stokes dealership location that was to be used for GM products; that the Delaware corporation was to pay Stokes $25,000 for an exclusivity agreement; that Stokes was to defend, indemnify, and hold harmless the Delaware corporation, its affiliates, and their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns from and against any and all claims or causes of action arising from the agreement; and that any notices or demands required or permitted under the agreement to be sent to the Delaware corporation, were to be sent to two addresses in Detroit, Michigan. For this Court to overlook the compelling evidence of a substantial effect upon interstate commerce found within the four corners of this transaction would require us to blind our eyes to reality. Moreover, even if we were to consider only the subject matter of the promise relating to the GM vehicles allegedly occurring during the negotiations, we are confronted with evidence that one of the parties is a Delaware corporation based in Detroit, Michigan, that agreed to pay to an Alabama corporation a three percent dealer-holdback credit, advertising credit, and floor-plan interest credit on certain vehicles. Suffice it to say that the transaction substantially affects interstate commerce.
 IV. Conclusion
The trial court's order denying GM's motion to compel arbitration is reversed and the case remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
Houston, See, Brown, Johnstone, Harwood, Woodall, and Stuart, JJ., concur.
Moore, C.J., dissents.
[1] In its brief, the Stokes dealership explains the dealer-holdback credit as follows:
 "The total invoice cost of a new automobile is due to the manufacturer at the time a vehicle is ordered by a dealership — not when it is sold. Since car dealerships must have an inventory on hand through which a consumer can browse and ultimately select a vehicle, the dealership must borrow funds to pay for that inventory. The automobile manufacturer pays for financing and maintenance for the first 90 days that a new vehicle is on the dealer's lot, in the form of a `Holdback.' Dealer Holdback is a percentage of the Manufacturer's Suggested Retail Price (MSRP) or invoice of a new vehicle that is paid to the dealer by the manufacturer to assist with the dealership's financing of the vehicle. [GM's] Dealer Holdback is 3%. [GM] retains 3% of the MSRP and remits the Holdback amounts to the dealer on a quarterly basis. After the expiration of 90 days, the manufacturer offers the dealer a lower interest rate for 30 more days. After 30 days, a dealer must pay market rates for financing during the time that a new vehicle is sitting on the dealer's lot."
[2] The trial court's disposition of Feeley's motion to compel arbitration is not before us.
[3] Rule 28, Ala.R.App.P., was amended effective June 1, 2002. Before that amendment, Rule 28(a)(5) addressed a party's failure to cite authority.
[4] Title 9 U.S.C. § 2.