Health Insurance Corporation of Alabama, Baptist Health Services Corporation, and Advantage Health (hereinafter referred to collectively as "HICA") appeal from the trial court's denial of their motion to compel arbitration of the claims filed against them by Edward Smith and Bernice Smith. The trial court denied HICA's motion to compel arbitration on the ground that the insurance contracts between the Smiths and HICA do not substantially affect or involve interstate commerce. We reverse and remand.
Health Insurance Corporation of Alabama, an Alabama corporation, issues Medicare supplement insurance policies under the trade name Advantage Health. Baptist Health Services, also an Alabama corporation, sponsors the policies. On April 23, 1993, Edward Smith and Bernice Smith, residents of Fort Deposit, completed applications and tendered the first month's premiums for Medicare supplement insurance policies for both of them. The insurance applications identified HICA as the insurer and listed a Montgomery, Alabama, address for the insurer.
In an affidavit filed in support of HICA's motion to compel arbitration, Craig Bodway, vice president of compliance for Olympic Health Management Systems, Inc. ("Olympic"), a subsidiary of Aon Corporation, stated that HICA's agent faxed the Smiths' insurance applications to Olympic, which managed the Medicare supplement policies for HICA, in Bellingham, Washington, for its review and approval. HICA then mailed the Smiths' original applications to Olympic in Washington state, and Olympic then mailed the Medicare supplement policies to the Smiths in Alabama. The policies identified HICA as the insurer and listed HICA's Montgomery address. Olympic maintained the Smiths' customer file in Washington and HICA had access to that file by computer. The Smiths' insurance applications indicate that they asked HICA to deduct their insurance premiums each month from a checking account they maintained in Alabama.
Olympic is the third-party administrator for all of HICA's Medicare supplement insurance policies. Olympic reviews in Washington all applications for HICA Medicare supplement policies, and Olympic makes all decisions as to whether to issue coverage. Once a policy is issued, Olympic handles any subsequent customer communications and claims administration from Washington. If an insured contacts HICA directly, HICA forwards the correspondence to Olympic in Washington for it to prepare a response. Olympic pays all *Page 1103 
claims either from its Bellingham, Washington, office or from the office of a subcontractor in Carrollton, Texas. HICA pays Olympic an administration fee for those services. The Smiths have not named Olympic as a defendant in their complaint.
The Medicare supplement insurance policies Olympic mailed to the Smiths contain an arbitration clause[1] and a clause giving the Smiths a 30-day inspection period within which to review the policy and, if they found any provision unsatisfactory, to cancel the policy and receive a full refund of any premiums they had paid. According to Bodway's affidavit, the Smiths did not cancel their policies during the 30-day inspection period.
The Smiths renewed their policies for a number of years.[2] On June 1, 2001, the Smiths, individually and as members of a putative class, sued HICA, alleging breach of contract, fraud, suppression, negligent misrepresentation, civil conspiracy to defraud, and breach of fiduciary duty.[3] *Page 1104 
In response to the complaint, HICA moved to compel arbitration and to stay the court proceedings pending arbitration. In support of its motion, HICA submitted two affidavits, a specimen copy of the insurance policy the Smiths purchased, and copies of the Smiths' insurance applications. The Smiths filed a response, but offered no evidence. After hearing oral argument, the trial court denied HICA's motion to compel arbitration. The trial court found that the insurance contract does not involve instrumentalities of interstate commerce, see Selma MedicalCenter, Inc. v. Fontenot, 824 So.2d 668 (Ala. 2001) (plurality opinion), and it found that when considered in light of the factors set out inSisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759 (Ala. 2000), "the contract does not substantially effect [(sic)] or involve interstate commerce." HICA appeals.
Section 2 of the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA"), provides, in pertinent part:
 "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."
Section 2 "has the effect of preempting conflicting Alabama law, in particular Ala. Code 1975, § 8-1-41(3), and thereby making enforceable a predispute arbitration agreement in a contract evidencing a transaction that involves interstate commerce." Homes of Legend, Inc. v. McCollough,776 So.2d 741, 745 (Ala. 2000) (footnote omitted).
"This Court reviews de novo a trial court's denial of a motion to compel arbitration." Homes of Legend, 776 So.2d at 745. "A `party seeking to compel arbitration has the burden of proving the existence of a contract calling for arbitration and proving that that contract involves a transaction affecting interstate commerce.'" Tefco Fin. Co. v. Green,793 So.2d 755, 758 (Ala. 2001) (quoting Ex parte Caver, 742 So.2d 168,172 n. 4 (Ala. 1999)). The party moving for arbitration must "`produce some evidence which tends to establish its claim.'" Jim Burke Auto.,Inc. v. Beavers, 674 So.2d 1260, 1265 (Ala. 1995) (opinion on application for rehearing) (quoting In re American Freight Sys., Inc., 164 B.R. 341,345 (D.Kan. 1994)). An analysis of whether a transaction affects interstate commerce "`is necessarily fact-intensive and in making that analysis we are limited to the facts contained in the record.'"Alternative Fin. Solutions, LLC v. Colburn, 821 So.2d 981, 984 (Ala. 2001) (quoting Brown v. Dewitt, Inc., 808 So.2d 11, 12 (Ala. 2001)).
HICA argues on appeal that the trial court misapplied the factors enunciated in Sisters of the Visitation, and that, because those factors are not a "perfect fit" to the facts of this transaction, this Court should analyze this transaction under the "within the `flow' of commerce" test articulated in Selma Medical Center, 824 So.2d at 674 *Page 1105 
(plurality opinion). HICA argues that the arbitration clause in the Medicare supplement policy is governed by the FAA and that the insurance policy substantially affects or is in the flow of interstate commerce.
The Smiths agree that "the factors enumerated in Sisters[of theVisitation] may not be a `perfect fit' to the insurance transaction at issue" (Smiths' brief at 11), but they argue that this Court must rely on the Sisters of the Visitation factors because the facts in Selma MedicalCenter are wholly inapposite to the present case.
The Smiths are correct that this case does not directly involve "the instrumentalities of interstate commerce, or persons or things in interstate commerce." Selma Med. Ctr., 824 So.2d at 674. The Smiths purchased insurance policies in Alabama from an Alabama company. As this Court, however, stated in General Motors Corp. v. Stokes, 850 So.2d 1239,1244 (Ala. 2002):
 "Both parties apparently assume that a case that involved a construction contract setting forth factors to be considered in determining whether the transaction had a substantial effect on interstate commerce must routinely be applied to complex commercial transactions arising in a totally different context. We can determine whether the transaction has a substantial effect on interstate commerce without substantial reliance upon, or disavowal of, the test set forth in Sisters of the Visitation[v. Cochran Plastering Co., 775 So.2d 759 (Ala. 2000)]."
HICA argues that its insurance transaction with the Smiths substantially affected interstate commerce. HICA faxed and mailed the Smiths' policy applications to Olympic in Washington. Olympic, and not HICA, made the actual decision to issue the insurance policies to the Smiths. Olympic, not HICA, mailed the Smiths' insurance policies from Washington to the Smiths in Alabama. Olympic, in Washington, maintained all records concerning the Smiths' insurance coverage. Olympic handled all customer service from Washington. Olympic paid claims either from Washington or through a subcontractor in Texas. While HICA is an Alabama company, and while it sold the insurance policies to the Smiths in Alabama, all administrative activity subsequent to the initial solicitation and purchase took place in Washington.[4]
This Court stated in Southern United Fire Insurance Co. v. Knight,736 So.2d 582, 586 (Ala. 1999):
 "[E]ven an intrastate transaction `involves' interstate commerce if it has a substantial effect on the generation of goods or services for interstate markets and their distribution to the consumer. Unquestionably, insurance transactions that stretch across state lines or *Page 1106 
intrastate insurance transactions that otherwise have the requisite (substantial) effect on interstate commerce constitute `Commerce among the several States' . . . ."
(Citations omitted.) The Smiths cite Southern United and Henderson v.Superior Insurance Co., 628 So.2d 365 (Ala. 1993), in support of the proposition that the sale of a single insurance policy does not substantially affect interstate commerce. Henderson is no longer good law. See Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 281 (1995) ("we accept the `commerce in fact' interpretation . . . even if the parties did not contemplate an interstate commerce connection"); Hurst v.Tony Moore Imports, Inc., 699 So.2d 1249, 1251 (1997) ("In Allied-BruceTerminix, the United States Supreme Court rejected the `contemplation of the parties' test that this Court had adopted in Ex parte Warren,548 So.2d 157 (Ala. 1989). . . .").[5]
In Southern United, this Court held that Southern United did not prove that its sale in Alabama of an automobile insurance policy affected interstate commerce. 736 So.2d at 586-87. Southern United is distinguishable from the present case on the facts, and the reasoning inSouthern United supports the proposition that the Smiths' insurance policies substantially affect interstate commerce. In Southern United, the insurance company sought to compel arbitration in a dispute with a policyholder over the terms of coverage in the policy. Southern United argued that the policy affected interstate commerce "solely on the basis that the policy provides for the coverage of Knight if he travels outside the State of Alabama." Southern United, 736 So.2d at 587 (See, J., concurring specially).
Southern United was an Alabama corporation that sold automobile insurance in Alabama. Southern United issued and administered its insurance policies from an office in Mobile, Alabama. Southern United never argued that its activities could in any way substantially affect interstate commerce. The only argument Southern United made that the transaction at issue in that case affected interstate commerce was that on the slight chance that the insured were to drive outside Alabama, and that while driving outside Alabama the insured were to damage his car, Southern United would provide coverage for that out-of-state accident. Southern United did not attempt to demonstrate that its insured even contemplated driving outside Alabama. Consequently, this Court held that Southern United did not prove sufficient facts to support its claim that the sale of the insurance policy at issue substantially affected interstate commerce. 736 So.2d at 586-87.
 "If interstate characteristics had been demonstrated, such as an out-of-state insurance company . . ., that, in the aggregate, could have a substantial effect on interstate commerce, then Southern United would have satisfied its burden. See United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 541, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944)."
Southern United, 736 So.2d at 587 n. 4 (See, J., concurring specially).
Although HICA makes an argument similar to Southern United's — that the Smiths have insurance coverage under their HICA policy anywhere they may travel in the United States — that is where the similarity between the arguments *Page 1107 
made in this case and those made in Southern United ends. Unlike Southern United, HICA also argues that the entire transaction with the Smiths substantially affects interstate commerce because the bulk of the transaction took place with Olympic in the state of Washington.
HICA's argument is analogous to AmSouth's argument in Chesser v.AmSouth Bank, 846 So.2d 1082 (Ala. 2002). In Chesser, AmSouth sought to compel Chesser to submit a dispute regarding a credit-life insurance policy to arbitration pursuant to arbitration clauses contained in a buyer's order, retail installment contract, and the certificate of insurance. This Court held that AmSouth "met its burden of proving that the transaction had a substantial effect on interstate commerce," 846 So.2d at 1085, because the
 "purchase of credit-life and credit-disability insurance was effectuated by Premier Chevrolet's forwarding a check to [an insurance company] in California. Similarly, the purchase of the extended service contract was effectuated by Premier Chevrolet's forwarding a check to `MS Dealer Service Corporation,' which is headquartered in Florida. Finally, Chesser obtained insurance providing comprehensive and collision coverage from State Farm Insurance Company, which is headquartered in Illinois."
846 So.2d at 108-86. By analogy, HICA demonstrates that an entirely different company, Olympic, located in Washington, made the decision to issue the Smiths' insurance policies. Olympic mailed the Smiths' insurance policies from Washington to the Smiths in Alabama. Olympic, in Washington, then administered the Smiths' insurance policies. Olympic maintained the records relating to the Smiths' insurance in Washington. Olympic would have processed any claims on the Smiths' policies in Washington or in Texas. Other than the initial solicitation, the entire transaction took place and was given effect in Washington or Texas.
The Smiths, relying on Alternative Financial Solutions, supra, argue that the Smiths' contact with Olympic was insubstantial and that HICA transmitted too little information to Olympic for the transaction to have affected interstate commerce. In Colburn, out-of-state companies ran payday-loan operations in Alabama. Customers filled out applications in Alabama offices, received loan checks in Alabama, and cashed the loan checks in Alabama. The payday lenders lent small amounts of money obtained from local sources. The payday lenders entered customer information into computers located in Alabama and accessed the Internet through those computers. This Court held:
 "Assuming, without deciding, that the movement of information in the manner presented here could substantially affect interstate commerce, we conclude that, in this case, the single Internet access involved in each of the payday-loan transactions does not rise to the level of a `substantial effect on interstate commerce' . . . ."
Colburn, 821 So.2d at 985.
Colburn does not say that the movement of information across state lines does not substantially affect interstate commerce. In this case, once the Smiths completed their insurance applications in Alabama, they initiated not just a single transaction, but a series of transactions with Olympic in Washington. Olympic made the actual decision to issue the insurance policies in Washington. Olympic maintained in Washington all of the records HICA accessed by computer. Olympic, in Washington, handled all subsequent administrative matters relating to the Smiths' policies. *Page 1108 
The Smiths argue that this Court should focus its analysis only on the facts surrounding the Smiths' purchase of the insurance policies — that the Smiths filled out their insurance applications in Alabama, that their policies were delivered in Alabama, that their policies list HICA's Alabama address, that they paid their premiums in Alabama, and that HICA is an Alabama company with an Alabama address doing business in Alabama. In Green Tree Financial Corp. v. Lewis, 813 So.2d 820, 823 (Ala. 2001), the Lewises argued that the sale of their mobile home "took place entirely in Alabama and was between Alabama consumers and an Alabama dealer and, therefore, . . . as of the time of the sale nothing had occurred that would trigger the application of the [FAA]." 813 So.2d at 823. This Court stated in response to that argument: "We cannot employ an unrealistically narrow construction of the `transaction' concept so as to limit our scrutiny to the events transpiring at the time of the sale." 813 So.2d at 824. In Lewis, this Court found it inconsequential that the loan documents listed Green Tree's name and a Montgomery address and that the Lewises did not contemplate all of the corporate relationships involved in the transaction. Id. Similarly, in this case we cannot ignore the "corporate relationships" and the "complex interstate commercial activity" surrounding the Smiths' purchase of the insurance policies.Id. While the Smiths completed their applications in Alabama and the policies listed HICA as the issuing company and showed an Alabama address, all of the administrative work necessary to complete the transaction took place in Washington. The insurance transaction in this case gives rise to a substantial effect on interstate commerce.
The Smiths also argue that the arbitration clause in each of their insurance policies is inapplicable to this litigation because, they say, the language in the arbitration clause is permissive and the scope of the clause is limited. HICA argues that the arbitration clause requires that all disputes shall be arbitrated if any of the parties elects to compel arbitration, and that the arbitration clause covers the Smiths' action.
The insurance policy reads, in pertinent part:
 "All disputes and controversies arising under Medicare SELECT policy and all disputes and controversies relating to benefits available shall be resolved pursuant to the Grievance Procedure as set forth herein. . . ."
 "ARBITRATION. In the event the policyholder is dissatisfied with the findings and rulings of HICA's Board of Directors or HICA is dissatisfied with the decision of the Grievance Committee or the Board of Directors, either the policyholder or HICA shall have the right to have the dispute submitted to binding arbitration before an arbiter under the commercial arbitration rules then in effect adopted and applied by the American Arbitration Association."
(Bold typeface and capitalization original.) The clause requires that "all" disputes be resolved according to the grievance procedure. It further requires that the insured first submit any dispute to HICA's grievance committee before turning to an outside remedy. If either HICA or the insured is dissatisfied with the results of HICA's internal grievance procedure, either party may submit the dispute to binding arbitration. The clause is permissive only to the extent that it stipulates that either party may choose to compel the other to arbitrate a dispute. If neither party exercises its right to compel arbitration, the parties are free to use other means to settle a dispute. The arbitration *Page 1109 
clause requires, however, that if either party chooses to exercise its right, then the parties shall submit the dispute to binding arbitration.
The Smiths cite United Wisconsin Life Insurance Co. v. Beaty,775 So.2d 191 (Ala. 2000), to support the proposition that their action falls beyond the scope of the arbitration clause in their insurance policies. United Wisconsin Life is inapposite, however, because it concerned the retroactive application of an arbitration clause contained in a rider to an insurance policy to compel arbitration concerning events that took place before the policy rider was issued, and it concerned the application of a requirement that an insured arbitrate disputes arising from the insurer's review process for denied claims. HICA argues that the present case differs from United Wisconsin Life because the arbitration clause in this case applies to all disputes, not merely disputes regarding denied insurance claims. HICA also argues that the specific language of the arbitration clause — that the clause reaches "all disputes and controversies relating to benefits available" — certainly reaches the Smiths' claim that the Medicare supplement insurance policies offered them no benefits. HICA argues finally that the fact that the arbitration clause uses the phrases "arising under [the policies] . . . and all disputes and controversies relating to benefits" indicates that the clause has a broad reach. In Green Tree Financial Corp. v.Shoemaker, 775 So.2d 149, 151 (Ala. 2000), this Court noted that "where a contract signed by the parties contains a valid arbitration clause that applies to claims `arising out of or relating to' the contract, that clause has a broader application than an arbitration clause that refers only to claims `arising from' the agreement." HICA argues that because the arbitration clause in the Smiths' insurance policies use the "arising under . . . and . . . relating to" language, the clause has a broad application. The Smiths' only response is that "arbitration under the Smiths' policies was only intended to come into play when the other remedies provided for within the grievance procedure had been exhausted, and when dissatisfaction remained with a decision concerning the administration, claims practices or services of the issuer." (Smiths' brief at 14.) The Smiths' claim that HICA sold them policies that would pay them no benefits. Such claims fall within the ambit of the arbitration clause.
We reverse the trial court's order denying HICA's motion to compel arbitration, and we remand the case for the trial court to stay the proceedings and to order the parties to arbitrate their dispute under the terms of the arbitration clause contained in the insurance policies.
REVERSED AND REMANDED.
HOUSTON, LYONS, BROWN, HARWOOD, WOODALL, and STUART, JJ., concur.
MOORE, C.J., and JOHNSTONE, J., dissent.
[1] The policy language reads, in pertinent part:
 "All disputes and controversies arising under Medicare SELECT policy and all disputes and controversies relating to benefits available shall be resolved pursuant to the Grievance Procedure as set forth herein. . . ."
 "ARBITRATION. In the event the policyholder is dissatisfied with the findings and rulings of HICA's Board of Directors or HICA is dissatisfied with the the decision of the Grievance Committee or the Board of Directors, either the policyholder or HICA shall have the right to have the dispute submitted to binding arbitration before an arbiter under the commercial arbitration rules then in effect adopted and applied by the American Arbitration Association. The arbiter shall be selected by mutual agreement of HICA and the policyholder. The cost and expense of arbitration shall be paid by the party initiating the demand of arbitration. The decision of the arbiter shall be binding upon the policyholder and HICA, and the arbiter's ruling shall be enforceable pursuant to state law.
 "Grievance Procedure Limitation. At the time that this policy is sold, the policyholder agrees to be bound by the grievance procedure outlined above."
(Bold typeface and capitalization original.)
[2] Nothing in the record indicates exactly why or when the Smiths canceled their policies. They may have canceled their policies sometime after 2000, because paragraph 11 of the Smiths' complaint alleges:
 "Defendants intentionally concealed their fraudulent scheme from Edward Smith and Bernice Smith and from Plaintiffs [members of putative class] through 2000 so as to toll all pertinent statutes of limitations."
[3] The substance of the Smiths' complaint is unclear. In the Smiths' answer to HICA's motion to compel arbitration, they indicate that in addition to being eligible for Medicare benefits, they both were eligible for Medicaid at the time they purchased their policies from HICA. The Smiths argue in their answer to HICA's motion to compel arbitration:
 "The principal alleged wrongful conduct was the concealment on the part of the defendants, at the time of the initial purchase and subsequently when the coverage was renewed, of the material fact that, if the Smiths were eligible for Medicaid benefits, they did not need Medicare supplement coverage and that the subject policy would pay no benefits because they were Medicaid-eligible."
It is worth noting, however, that "Acknowledgment #7" in a list of "Acknowledgments" on the insurance applications signed by the Smiths reads:
 "The Applicant understands there is no need for more than one Medicare supplement policy. As of age 65, he/she may be eligible for benefits under Medicaid and therefore not need a Medicare supplement. Benefits and premiums under the Medicare supplement policy will be suspended during entitlement to benefits under Medicaid for 24 months, as long as suspension is requested within 90 days of becoming eligible for Medicaid. When you are no longer entitled to Medicaid, your policy will be reinstituted if requested within 90 days of losing Medicaid eligibility."
The insurance application asked whether the applicant was covered by Medicaid, and the Smiths indicated that they were not covered by Medicaid. The application did not ask the applicant to list his or her income. The application asked the applicant to describe where he or she lives, and the Smiths checked a box next to the words "Own Home." The application asked whether the applicant had an existing Medicare supplement policy, and Edward Smith, then age 70, checked the box marked "yes," and wrote the name "Humana" on the line next to the word "Company." Bernice Smith, who turned 65 on the date the HICA application was completed, indicated that she did not have an existing Medicare supplement policy. The Smiths also selected the "automated payment" option, pursuant to which HICA deducted premiums for the policies directly from the Smiths' checking account.
[4] The record does not indicate clearly how HICA handled the monthly premium payments. The Smiths' policy applications, which are properly in the record, indicate that the Smiths initially instructed HICA to debit premium payments from their checking account in Alabama. Nothing in the record indicates whether the Smiths relied on the automatic debit for the entire time the policies remained in force. The statement of facts in the Smiths' brief to this Court states that HICA continued to accept premium payments from the Smiths for years, but the statement does not offer any other information about the payment process. Even if the Smiths' brief was more clear, "This Court is bound by the record, and it cannot consider a statement or evidence in a party's brief that was not before the trial court." Ex parte American Res. Ins. Co., 663 So.2d 932, 936
(Ala. 1995). The Smiths have introduced no evidence showing where the premiums went. The record is silent as to whether Olympic or HICA, or some other party, received and processed the Smiths' premium payments.
[5] Henderson, 628 So.2d at 367, applied the "contemplation of the parties" test articulated in Ex parte Warren.